BRIAN F. CASEY, Plaintiff-Appellant, v. JERRY YUSIM NISSAN, INC., et al., Defendants-Appellees.

Third District   No. 3—97—0446

Opinion filed April 21, 1998.

BRESLIN, J., specially concurring.

Stephen J. Schostok, of DiMonte, Schostok & Lizak, of Park Ridge, and Michael W. Rathsack (argued), of Chicago, for appellant.

Thomas K. Hanekamp (argued) and Joy Silzer Fitzgerald, both of Tressler, Soderstrom, Maloney & Priess, of Chicago, for appellee.

JUSTICE LYTTON delivered the opinion of the court:

Plaintiff Brian Casey filed a complaint against Jerry Yusim Nissan, a car dealership, and two of its employees under the Consumer Fraud and Deceptive Business Practices Act (Act) (815 ILCS 505/1 *et seq.* (West 1996)). In his complaint, Casey alleged that the defendants had misrepresented the condition of a car that he had purchased from them.

After a bench trial, the court found in favor of the defendants. The defendants then requested attorney fees and costs under section 10a(c) of the Act (815 ILCS 505/10a(c) (West 1996)), and the trial court awarded them $30,000. Casey appeals the award of attorney fees. We reverse.

## FACTS

In 1992, Casey purchased a 1983 BMW from Jerry Yusim Nissan for $5,100. Prior to buying the car, Casey took it out for a test drive and noticed smoke or steam rising from under the hood. Casey testified that the salesperson told him the dealer would fix the problem. Casey stated that on the following day another salesperson, defendant Mary Ann Scott, confirmed that the dealer would take care of the problem. Scott, however, denied telling Casey that the problem would be fixed. Casey also testified that a third salesperson, defendant Robert Schmerler, stated the dealership would take care of the problem.

The next time Casey spoke to Schmerler, Schmerler indicated that the car's heater core valve was being replaced. On the same day, Scott left a message for Casey, indicating that the car was not ready because the radiator was being fixed. When Casey picked up the car, he was told that it had been fixed and that the heater core valve had been replaced. However, when the heater core valve was replaced later in the year, it was found to be part of the car's original equipment.

An inspection at a gas station revealed no major problems, and as Casey saw no more smoke or steam emitting from the car, he decided to purchase it. Later, his family mechanic inspected the car for leaks and found none.

When Casey had no problems with the car during the next two weeks, he drove it to California. During the trip, the oil light came on, and Casey added a quart of oil. He did not see any smoke or steam coming from the engine at that time. The next day, the coolant light came on, and Casey added nearly a gallon of antifreeze. After he had been in California for about three weeks, Casey noticed smoke coming from under the hood and from the car's tailpipe.

Casey took the car to a BMW repair shop, which estimated the cost of repairs at $5,000 to $6,000. Casey began to consider legal action against the defendants and took the car to another BMW repair shop. He told the mechanic at that shop, Hal Epstein, about the problems he had originally noticed with the car and showed him documents from the dealership and the gas station. Casey told Epstein that he saw smoke coming from the tailpipe when he started the car. Epstein diagnosed the problem as a cracked cylinder head, which he believed existed when Casey bought the car. Epstein told Casey the dealership had used Stop Leak to temporarily fix the leak, but this was not a permanent solution. Epstein repaired the car, and the problems ended.

Casey filed a complaint under the Act against the defendants, claiming that they had sold him a used car with serious engine problems that they claimed to have repaired prior to the sale. Casey also asked Epstein to write a letter outlining his findings and opinions, which he did. In the letter, Epstein stated that Casey had told him the tailpipe emitted steam each time the car was started. Epstein also indicated that Casey had told him the dealership had used Stop Leak in the car. At trial, Casey denied making this statement to Epstein and indicated that he had not even heard of Stop Leak before he met Epstein. The invoice from the gas station, however, noted the presence of sealer in the car's radiator.

Epstein later reviewed Casey's deposition and changed several of his opinions based on new information in it. Epstein noted several conflicts between Casey's initial statements to him and the statements in the deposition. For example, Epstein claimed that Casey's deposition testimony that the tailpipe did not smoke until just before he took the car in for repair in California contradicted his prior statement to Epstein that the tailpipe smoked every time he started the car. Casey's deposition also indicated that he did not have any real problems with the car until after he arrived in California.

Epstein stated that Casey could not have driven the car from Illinois to California if the cylinder head had been in the condition he had found it. He testified that the point at which the tailpipe began to smoke was critical to determining when the crack developed. At trial, Epstein's videotaped evidence deposition was played. In it, Epstein stated that he believed the crack developed while Casey was in California and that it was caused by a defect in the casting of the cylinder head. Epstein also believed that the steam under the hood that Casey saw after test-driving the car was probably caused by a minor cooling system leak. Although Epstein had not looked for sealer in the cracked head when he repaired the car, he expressed doubts

that Casey's trial expert could have found any sealer in the crack after Epstein took the car apart and washed the block.

Epstein's testimony was contradicted by that of Casey's expert witness, Philip Arendt. Arendt reviewed Casey's deposition, Epstein's letter, the documents from the dealership, and the damaged cylinder head. When Arendt examined the cylinder head under a microscope, he found traces of sealer in the crack. He testified that the sealer could have temporarily prevented a mechanic from seeing the symptoms of a cracked head, but that the problem would eventually return. Arendt concluded that there was a small crack in the head when Casey bought the car and that the crack grew over time as the car was driven. The growth in the crack was signaled by the large increase in the car's use of antifreeze and oil that Casey noted during his trip to California.

At the bench trial, the trial court found in favor of the defendants, who then requested more than $41,000 in attorney fees as prevailing parties under section 10a(c) of the Act (815 ILCS 505/10a(c) (West 1996)). The court awarded the defendants $30,000 in fees. Casey appeals only the award of attorney fees.

## ANALYSIS

### I

■ The applicable standard of review on appeal is whether the trial court abused its discretion in granting the fee award. See *Graunke v. Elmhurst Chrysler Plymouth Volvo, Inc.*, 247 Ill. App. 3d 1015, 1020, 617 N.E.2d 858, 862 (1993); *Haskell v. Blumthal*, 204 Ill. App. 3d 596, 599, 561 N.E.2d 1315, 1319 (1990).

### II

The sole issue before us is the award of attorney fees to the defendants. First, we must decide whether the same test should be used to award fees to plaintiffs and to defendants under the Act. Casey argues that the intent of the Act would be frustrated, if not emasculated, if a different standard was not applied. The defendants respond that the standard for the award of fees under the Act should be the same for either party.

■ Section 10a(c) of the Act states:

"Except as provided in subsections (f), (g), and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party." 815 ILCS 505/10a(c) (West 1996).

The purpose and intent of the Act are to eliminate " 'all forms of

deceptive and unfair business practices and to grant appropriate remedies to defrauded consumers.'" *Warren v. LeMay*, 142 Ill. App. 3d 550, 563, 491 N.E.2d 464, 471 (1986), quoting *American Buyers Club v. Honecker*, 46 Ill. App. 3d 252, 257, 361 N.E.2d 1370, 1374 (1977). The provisions of the Act are to be liberally construed to effect its purpose. 815 ILCS 505/11a (West 1996); see also *Malooley v. Alice*, 251 Ill. App. 3d 51, 56, 621 N.E.2d 265, 268 (1993).

■ The question of whether fee requests made by both prevailing plaintiffs and prevailing defendants must satisfy the same test was addressed and answered in *Haskell*. In that case, the fourth district reviewed federal civil rights cases and concluded that different standards should be used for plaintiffs and defendants. *Haskell*, 204 Ill. App. 3d at 602, 561 N.E.2d at 1318. The court found that civil rights and consumer statutes are both designed to provide plaintiffs with a remedy that otherwise would not be available or affordable. The Act's fee provisions encourage the filing of complaints intended to protect consumers' interests even where the amounts at issue are not normally large enough to sustain litigation. If plaintiffs in these cases are routinely subject to liability for the defendants' fees and costs, such actions would be deterred, defeating the purpose of the Act. *Haskell*, 204 Ill. App. 3d at 602, 561 N.E.2d at 1318. We concur with the reasoning in *Haskell* and hold that the legislative intent of the Act dictates the application of a different standard for fee requests made by successful defendants.

### III

■ Having decided a different test is appropriate for prevailing plaintiffs and defendants, we must now decide what the test should be. The award of fees to a prevailing plaintiff is within the discretion of the trial court. See *Grove v. Huffman*, 262 Ill. App. 3d 531, 539, 634 N.E.2d 1184, 1189 (1994). In *Haskell*, the court found that an award of fees to a prevailing defendant depended on a finding of bad faith by the plaintiff. *Haskell*, 204 Ill. App. 3d at 602, 561 N.E.2d at 1319. The court applied the standard for imposing sanctions under Supreme Court Rule 137 (134 Ill. 2d R. 137) to evaluate a plaintiff's bad faith. Under Rule 137, the court must consider whether the allegations in the complaint are unwarranted by existing law or a good-faith argument for a change in existing law, and whether they are designed to harass or unduly delay the proceedings. *Haskell*, 204 Ill. App. 3d at 603, 561 N.E.2d at 1319.

In *Graunke*, the second district proposed a five-factor test, based on the criteria for fee awards under the Employee Retirement Income Security Act (29 U.S.C. § 1132(g)(1) (1988)). These factors include: (1)

the degree of bad faith shown by the opposing party; (2) the opposing party's ability to pay the fee award; (3) the deterrent effect of the fee award; (4) whether the party requesting fees attempted to benefit all consumers or businesses or to resolve a significant legal question concerning the Act; and (5) the relative merits of the parties' positions. *Graunke*, 247 Ill. App. 3d at 1022-23, 617 N.E.2d at 863-64.

Both the *Graunke* and *Haskell* decisions recognized the importance of a finding of bad faith in evaluating a request for fees under the Act, as well as the significant policy interests underlying the Act. *Haskell*, 204 Ill. App. 3d at 602, 561 N.E.2d at 1318-19; *Graunke*, 247 Ill. App. 3d at 1022-23, 617 N.E.2d at 863-64. Clearly, bad faith is the pivotal factor in awarding attorney fees to prevailing defendants under the Act. Thus, a trial court must first determine whether the plaintiff acted in bad faith. To allow statutory fees to be awarded to defendants without requiring this threshold finding would seriously undermine the Act's goal of vindicating consumers' rights. *Haskell*, 204 Ill. App. 3d at 602, 561 N.E.2d at 1318; see also *Graunke*, 247 Ill. App. 3d at 1022, 617 N.E.2d at 863.

We agree with *Haskell* that Rule 137 provides the proper standard for bad faith, that is, whether the knowledge, information, and belief in the plaintiff's pleadings are not " 'warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law,' and whether they are 'interposed *** to harass or to cause unnecessary delay.' " *Haskell*, 204 Ill. App. 3d at 603, 561 N.E.2d at 1319, quoting 134 Ill. 2d R. 137.

If a court finds bad faith under this standard, it may then proceed to analyze the remaining factors enumerated in *Graunke*.

## IV

■ Our review of the facts in this case reveals that Casey did not act in bad faith by continuing to pursue his complaint after Epstein recanted his original opinion. Casey had retained another expert witness, Philip Arendt. The defendants did not object to Arendt's qualifications as an expert. Arendt had examined the cylinder head, along with various related documents, and concluded that a small crack existed when Casey bought the car. Arendt also testified that the growth in the crack was manifested by the car's increased use of oil and antifreeze during Casey's trip to California. Arendt was aware of Epstein's testimony and was unwavering in his opinion that the cylinder head was cracked when Casey bought the car.

Although the trial court was not required to find Arendt's testimony more credible than Epstein's, it was hardly bad faith for Casey to pursue his claim based on Arendt's testimony. Arendt's

expert opinion sufficiently supported the allegations in Casey's complaint to preclude a finding of bad faith. *Cf. H&H Sand & Gravel Haulers Co. v. Coyne Cylinder Co.*, 260 Ill. App. 3d 235, 247-48, 632 N.E.2d 697, 705 (1994) (finding the plaintiffs' reliance on experts' conclusion that an explosion was not caused by a gasoline leak precluded a showing of bad faith by plaintiffs when they later destroyed a gasoline-powered welder and generator).

Since we have found Casey did not act in bad faith, we need not review the remaining factors listed in *Graunke*.

## CONCLUSION

The judgment of the circuit court of Du Page County is reversed.

Reversed.

SLATER, J., concurs.

JUSTICE BRESLIN, specially concurring:

I am unconvinced that the *Haskell* and *Graunke* courts interpreted section 10a(c) as the legislature intended. I arrive at this conclusion because the entire thrust of section 10a addresses the relief that those who suffer actual damages can receive under the Act and how that relief is to be acquired. Section 10a(c) empowers the court to grant injunctive relief to these people and in the same breath empowers the court to award reasonable attorney fees and costs to the "prevailing party." 815 ILCS 505/10a(c) (West 1996). In light of the purposes of the Act, it appears to me that the legislature was referring to a party who prevails in bringing an action for actual damages under section 10a. Such an interpretation would exclude defendants.

However, I recognize that *Haskell* and *Graunke* were decided several years ago. I have to presume that the legislature's silence regarding the courts' interpretation of section 10a(c) demonstrates its intent to acquiesce to judicial construction. *Fink v. Ryan*, 174 Ill. 2d 302, 673 N.E.2d 281 (1996); *People v. Hairston*, 46 Ill. 2d 348, 263 N.E.2d 840 (1970); *People v. Avery*, 277 Ill. App. 3d 824, 661 N.E.2d 361 (1995). For this reason, I concur.