RICHARD G. KRAUTSACK, Plaintiff-Appellant, v. DAVID ANDERSON, d/b/a David Anderson Safaris, *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—01—1249

Opinion filed March 29, 2002.

Gordon, Glickman, Flesch & Woody, of Chicago (James A. Flesch, of counsel), for appellant.

John J. Pembroke & Associates, P.C., of Park Ridge (John N. Bielski II, of counsel), for appellees.

PRESIDING JUSTICE BURKE delivered the opinion of the court: Plaintiff Richard Krautsack appeals from three orders of the

circuit court granting summary judgment in favor of defendants David Anderson (Anderson), doing business as David Anderson Safaris, and Luxury Adventures, Ltd. (Luxury Adventures), striking his motion for reconsideration, and granting attorney fees and costs to Anderson and Luxury Adventures pursuant to Supreme Court Rule 137 (155 Ill. 2d R. 137) and the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/10a(c) (West 1998)) on Krautsack's complaint against defendants alleging breach of contract and consumer fraud. On appeal, Krautsack contends that the trial court erred in granting summary judgment on both his consumer fraud claim and his breach of contract claim, that it erred in striking his motion for reconsideration because the motion was timely, and that it erred in granting costs and fees to Anderson and Luxury Adventures because the facts of the case did not support or warrant the imposition of sanctions. For the reasons set forth below, we reverse and remand.

## STATEMENT OF FACTS

This lawsuit arose as a result of Krautsack's trip to East Africa in January 1998, which was arranged by Anderson and his corporation Luxury Adventures, doing business as David Anderson Safaris. Because of El Nino, although unknown and unidentified at that time, it rained the entire time Krautsack toured Africa. On September 1, 1998, Krautsack filed a complaint against Anderson, alleging claims based on the Consumer Fraud Act and breach of contract, and seeking a refund of the cost he had paid for defendants' services and his trip. On December 16, 1999, Anderson filed a motion for summary judgment. Subsequently, Krautsack filed an amended complaint, adding Luxury Adventures as a defendant, alleging a cause of action based on the Consumer Fraud Act. On February 23, 2000, Anderson and Luxury Adventures filed a motion for summary judgment. Thereafter, Krautsack filed an "Opposition to Defendants' Motion for Summary Judgment" and Anderson and Luxury Adventures filed a reply.

Various evidence was offered in support of and in opposition to the motion for summary judgment, including the depositions of Anderson and Krautsack. Anderson testified that he was the president of Luxury Adventures, a California corporation, doing business as David Anderson Safaris, of which he was the managing member. The company was in the business of marketing African safaris to affluent clients. With respect to refunds in general, Anderson first testified that he had refunded money to unhappy travelers in the past. However, it was not a regular occurrence and he estimated that it occurred less than 25 times. Anderson then stated that credits were

given to such customers, not refunds. Subsequently, Anderson stated that he had given partial refunds. According to Anderson, the company only gave refunds if the services were not supplied.

With respect to complaints about bad weather, Anderson testified that he had approximately five complaints about weather prior to Krautsack's complaint. However, he did nothing about the complaints, taking the position that he could not be responsible for the weather.

According to Anderson, Krautsack first contacted his company in the summer of 1997. Anderson, or someone in his office, spoke to Krautsack in December 1997 with respect to cholera, but he could not remember to whom. Anderson further stated that when travel consultants have any significant conversation with a customer, an entry and notes are made on what the company refers to as the "history report." However, he admitted that consultants do not always enter information on the report. After reviewing the history report from 1997, Anderson testified that he spoke to Krautsack on December 16, 1997, with respect to cholera, although he had no memory of the conversation. Anderson also did not recall Krautsack mentioning any concern about the weather or any fax from Krautsack to him of a newspaper article about the weather in Africa.

Anderson further testified that on January 6, 1998, Krautsack contacted his office regarding his concerns about the weather and road conditions in Africa. At this time, Krautsack raised the question of postponement. According to Anderson, he told Krautsack that before he decided what to do, Anderson would contact the people in Africa and see what the report was. Anderson then contacted various individuals in Africa to ascertain the conditions—Willy of Kobi Safaris with respect to Tanzania; Ann Birch of Cheli & Peacock with respect to Kenya; and Duncan of Destination Africa. Anderson then quoted the responses from these individuals in a letter he faxed to Krautsack on January 7, and advised Krautsack to call if the information did not address his concerns. Anderson never received a call from Krautsack prior to his departure. According to Anderson, the information he received told him that there had been rain and it was muddy, but that with four-wheel drive vehicles, safaris were proceeding as normal. Anderson stated that he left the decision of postponement up to Krautsack. He denied that he "pushed" Krautsack to continue with the trip. Anderson also denied that Krautsack ever asked him to reschedule the safari, but, if he had, it would "definitely" have been possible. However, according to Anderson, if Krautsack had rescheduled, he would have lost any money he had paid for the safari.

Anderson also testified that after being contacted by Krautsack following his trip, which according to Anderson first occurred on March

12, 1998, he asked one of the African suppliers for a refund of Krautsack's payment for the safari, but was told no refund would be made because Krautsack had received the services for which he had paid. According to the information Anderson received, Krautsack went to all the game parks and did not miss any game drives.

Anderson further testified that over the last 100 years, the rainy season in East Africa has been in April and May, there have been short rains in November, and January is generally dry. According to Anderson, the African weather was "extremely predictable" in the past. He also stated that the weather Krautsack experienced was "extremely wet. Totally out of character." The rain started in November 1997 and continued through June and July 1998. At the time of Krautsack's trip, no one was yet aware that it was due to the effects of El Nino.

With respect to the e-mail sent by Anderson and relied upon by Krautsack, detailed below, Anderson testified that this e-mail was sent sometime after March 12, but before March 30, and was an attempt to obtain some refund compensation for Krautsack. Anderson admitted that in the e-mail he stated, because he was fighting for his client, that Krautsack had a valid claim. Although acknowledging that he used the term "pushed," in reference to Krautsack continuing with his safari plans, in the e-mail, according to Anderson, the term "pushed" was "open to interpretation." In addition, Anderson admitted that this term could be interpreted differently from the statements made in his letter to Krautsack on January 7, 1998, to the effect that he was leaving the decision of postponement of Krautsack's trip up to him.[1] Anderson further testified that the document signed by Krautsack, purporting to be the contract between the parties, did not address the issue of postponement.

Krautsack testified that he first contacted Anderson's company in March 1997, after being referred to it by a neighbor. He initially dealt with Gail, Anderson's ex-wife. She advised Krautsack to travel in the dry season, which she stated was during December and January. Krautsack further testified that he spoke to Anderson's company often, "fine tuning" his travel plans.

According to Krautsack, the issue of the weather in Africa first arose on December 7, 1997. His wife had found a newspaper article regarding various conditions in Africa, which Krautsack faxed to Anderson's office. Krautsack further testified that he left a voice mail

---

[1]This is not stated in Anderson's January 7 letter to Krautsack. What Anderson stated was that if the information he had provided did not address Krautsack's concerns, Krautsack should call Anderson.

message on Anderson's telephone, asking for an explanation. Leonora, another individual in Anderson's office, called Krautsack back and stated that Anderson would give him a response. Krautsack believed that Anderson called in the middle of December 1997, speaking to his wife, and discussing cholera. Anderson failed to address Krautsack's concern with respect to the rain. Krautsack believed that he again contacted Anderson in the latter part of December with respect to the rain in Africa. Krautsack stated that he again faxed the same newspaper article to Anderson.

Krautsack further testified that Anderson returned his call on January 6, 1998. Anderson advised him that he would fax information to Krautsack, but, according to Krautsack, Anderson led him to believe that the rain in Africa was "not a big deal." Krautsack stated that he did not respond to Anderson's January 7 fax because, from his conversation with Anderson the day before, he believed that "everything was fine."

With respect to the prevailing weather conditions in Africa during his actual trip, Krautsack testified that it was wet, rainy, and muddy in Masai Mara and that under such conditions the "cats go." He stated that sites were "definitely" inaccessible depending on where he was supposed to go. According to him, certain roads were unusable. Krautsack admitted that he went on game drives every day and saw animals. With respect to his Rusinga fishing trip, Krautsack stated that he was able to fish. However, he stated that the plane that took him to the fishing destination should never have been allowed to take off due to the wet conditions of the airfield. Krautsack also testified that he should never have gone to Ol Donyo Wuas because the conditions there were terrible. Instead of driving to game drives, he had to walk because the roads were inaccessible. At Giraffe Manor, he was confined to the building and could not walk the grounds. Lastly, with respect to Tanzania, Krautsack testified that this region suffered from severe flooding and many roads were washed out. He was supposed to drive to the Ngorongor Crater, which was to be a short drive, but he had to fly because of road conditions. According to Krautsack, his driver did in fact drive, which took 14 hours. Upon arriving at the crater, a good half of it was inaccessible and Krautsack had to go all the way around the crater to access it rather than accessing it from his accommodations because the roads were washed out. Krautsack stated that he never complained to any of the individuals at the particular camps about the conditions because he had contracted with Anderson, not those individuals. Upon returning from his trip, Krautsack wrote to Anderson on January 27 expressing the problems with his vacation.

Anderson and Luxury Adventures supported their motion with a

letter faxed by Anderson to Krautsack on January 7, in which he related the effects of the rains in East Africa. The letter stated that he had contacted three individuals in Africa. Their general responses were that it was wet and rainy. With respect to Masai Mara, the individual indicated that this was the wettest area on Krautsack's itinerary, but that, with four-wheel drive vehicles, current groups of safaris were getting around fine. With respect to Tanzania, the individual indicated that safaris were ongoing and were getting around fine, despite the rain. With respect to the Ngorongor Crater, although indicating it was a bit difficult getting around, the individual stated that Anderson's "client ought not to worry." Anderson quoted the responses of each individual in his letter to Krautsack.

Krautsack offered a copy of the newspaper article that his wife had discovered in early December. The article stated that there had been "torrential rains" in East Africa causing heavy flooding and that the danger of disease existed. It recommended that individuals consider deferring travel to Kenya and Tanzania until the weather cleared. The article also noted that political reforms were underway in Kenya. Krautsack testified that he faxed a copy of this article to Anderson. Krautsack placed an arrow and "?" next to the statements with respect to the rain and reform, and circled and placed "?" next to the statements with respect to diseases. Krautsack also offered an e-mail written by Anderson, sometime in March according to Anderson's testimony, to one of the African suppliers. In this e-mail, Anderson made the following statements: "I need to satisfy him [Krautsack] that while he did not get what he had paid for, David Anderson Safaris will make it up to him." Additionally, Anderson stated, "I think I was protecting a lot of asses when I 'pushed' Mr. Krautsack to continue with his safari plans." Anderson also stated that he was not in a position to refund Krautsack's money but believed that Krautsack had a "valid" claim and that Anderson would like to give Krautsack a full credit. Krautsack also offered another e-mail written by Anderson, undated, to Willy, Peter, and Duncan (African suppliers) in which Anderson stated, "[G]iven that I recommended that [Krautsack] not cancel or reschedule [his] safari," Anderson was seeking compensation for Krautsack.

Following a hearing,[2] the trial court granted summary judgment in favor of Anderson and Luxury Adventures on all counts of Krautsack's complaint on June 21, 2000. Thereafter, Anderson and Luxury Adventures filed a motion for attorney fees pursuant to the Consumer

---

[2]There is no report of proceedings in the record of this hearing or of any hearings on sanctions.

Fraud Act. On August 2, Krautsack filed a motion to reconsider the court's order granting summary judgment. In response, Anderson and Luxury Adventures filed a motion to strike the motion to reconsider on the basis that the motion was not timely filed. On November 3, the trial court sustained Anderson and Luxury Adventures' motion to strike. On December 4, Anderson and Luxury Adventures filed a supplemental petition for fees pursuant to the Consumer Fraud Act, as well as a motion for Rule 137 sanctions. After a hearing, the trial court granted Anderson and Luxury Adventures' request for fees, pursuant to both provisions, but reduced the amount Anderson and Luxury Adventures sought and awarded Anderson and Luxury Adventures fees of $10,499 and costs of $104. This appeal followed.

## ANALYSIS

■ A motion for summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1998); *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 530, 675 N.E.2d 897 (1996). In ruling on a motion for summary judgment, the trial court should not resolve disputed factual matters or make credibility determinations. *Prairie v. University of Chicago Hospitals*, 298 Ill. App. 3d 316, 326, 698 N.E.2d 611 (1998). The trial court's function "is simply to determine whether a factual controversy exists and, if not, whether the movant is entitled to judgment as a matter of law." *Winston & Strawn v. Nosal*, 279 Ill. App. 3d 231, 236, 664 N.E.2d 239 (1996). All evidence is to be liberally construed in favor of the non-movant. *In re T.J.*, 319 Ill. App. 3d 661, 671, 745 N.E.2d 608 (2001). The trial court may not weigh the evidence. *Watkins v. Schmitt*, 172 Ill. 2d 193, 211, 665 N.E.2d 1379 (1996). We review the trial court's decision *de novo*. *McNamee v. State of Illinois*, 173 Ill. 2d 433, 438, 672 N.E.2d 1159 (1996). Our duty, like the trial court's, "is not to judge the strength of the evidence or to weigh the credentials, credibility and testimony of one deponent against another." *McCullough v. Gallaher & Speck*, 254 Ill. App. 3d 941, 948, 627 N.E.2d 202 (1993).

In the instant case, we believe that Anderson's March 1998 e-mail alone creates numerous genuine issues of material fact, discussed more fully below, that were sufficient to preclude summary judgment on both Krautsack's consumer fraud and breach of contract claims. We also find that the trial court, in granting summary judgment, would have had to make credibility determinations where the evidence was contradictory; a matter that the trial court cannot resolve in ruling on a motion for summary judgment.

## I. Consumer Fraud Claims (Counts I and II)

Krautsack first contends that the trial court erred in granting summary judgment on his consumer fraud claims.

■ "The omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud pursuant to section 2 of the Consumer Fraud Act." *Lipinski v. Martin J. Kelly Oldsmobile, Inc.*, 325 Ill. App. 3d 1139, 1144, 759 N.E.2d 66 (2001). To state a cause of action under the Consumer Fraud Act, a plaintiff's complaint must set forth specific facts to show:

> " '(1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the deception occurred in the course of conduct involving a trade or commerce; and (4) the consumer fraud proximately caused the plaintiff's injury.' [Citation.]" *Lipinski*, 325 Ill. App. 3d at 1145.

Krautsack argues that he presented sufficient evidence that Anderson and Luxury Adventures concealed material facts and deceived Krautsack on January 6, 1998, creating a genuine issue of material fact as to whether Anderson and Luxury Adventures violated the Consumer Fraud Act. Specifically, Krautsack maintains that Anderson and Luxury Adventures concealed their own financial interest and motives in convincing him not to postpone his trip. According to Krautsack, Anderson and Luxury Adventures advanced their own personal interests at the expense of his interest, which they cannot do as fiduciary agents of Krautsack's. Krautsack relies upon the e-mail sent by Anderson to the African supplier. Krautsack also argues that Anderson and Luxury Adventures were under a conflict of interest, which obligated them to subordinate their own interests to Krautsack's or to disclose the conflict of interest to him. Instead, Krautsack argues, Anderson and Luxury Adventures concealed this conflict of interest from him. Lastly, Krautsack maintains that Anderson's January 7 letter contained inadmissible hearsay and the trial court erroneously relied upon it.

Anderson and Luxury Adventures contend that Krautsack failed to present any evidence of a communication that constituted a deceptive act. Rather, they maintain that the record clearly shows that Anderson advised Krautsack of the weather conditions and, therefore, Anderson did not conceal facts with respect to the weather. Anderson and Luxury Adventures also argue that the first and only communications with respect to the weather was Krautsack's telephone call to Anderson on January 6 and Anderson's fax to Krautsack on January 7, pursuant to Krautsack's own deposition testimony. Additionally, Anderson and Luxury Adventures maintain that there is no evidence that Anderson said the trip would not be disrupted or made more dif-

ficult because of the rain.[3] Lastly, Anderson and Luxury Adventures maintain that the e-mail relied upon by Krautsack is irrelevant because it does not establish a deceptive act.

Krautsack responds that he did not allege that Anderson said the weather would be dry; rather, he alleged that Anderson stated that, despite the rain, the trip would not be disrupted, and that these statements were made in the context of concealing Anderson and Luxury Adventures' interests. Krautsack maintains that it is not his position that Anderson's statements were false or deceptive, or that Anderson and Luxury Adventures were responsible for the weather, but, rather, his position is that Anderson and Luxury Adventures failed to disclose their personal interest in having Krautsack not postpone the trip.

■ Initially, assuming, *arguendo*, that Krautsack has not waived the issue, we disagree with him that Anderson's January 7 letter constituted inadmissible hearsay. The statements of the African contacts were not offered for the truth of the matter contained therein. Rather, they were offered to demonstrate Anderson's knowledge or notice and the basis for his course of action. See 2 R. Hunter, Trial Handbook for Illinois Lawyers—Civil § 48.1, at 182 (7th ed. 1997) (a statement offered for the truth of the matter asserted may be admissible if offered for the limited purpose of explaining another's conduct); 2 R. Hunter, Trial Handbook for Illinois Lawyers—Civil § 48.2, at 183 (7th ed. 1997) (a statement is not hearsay unless it is used to prove the truth of the matter contained in the statement); 2 R. Hunter, Trial Handbook for Illinois Lawyers—Civil § 49.28, at 223 (7th ed. 1997) (where knowledge or notice to a party is at issue, relevant statements made to him may be admitted for the purpose of showing such knowledge or notice).

Substantively, Krautsack's claim is based on Anderson's failure to disclose certain facts with respect to his motives and interests based on his fiduciary duty to Krautsack. Anderson and Luxury Adventures do not respond to this argument, just as they did not do so in the trial court. In addition, the trial court failed to address this argument and perhaps did not grasp the scope of Krautsack's theory. However, because our review is *de novo*, we may review it.

In connection with this claim, we first address the question of when the issue of weather was first raised by Krautsack. Anderson and Luxury Adventures argued, and the trial court agreed, that the issue was first raised on January 6. However, this conclusion ignored

---

[3]This argument is clearly contrary to the evidence. In Anderson's January 7 letter to Krautsack, he specifically stated, "I would say that any rain that you might experience will have little affect on your overall safari experience."

the totality of Krautsack's deposition testimony and merely focused upon a single statement taken out of context. Krautsack testified that Anderson contacted him in mid-December and spoke only about cholera. However, according to Krautsack's testimony, Anderson spoke to Krautsack's wife, not Krautsack. Krautsack also stated that he then called Anderson back at some time prior to the end of December with respect to the question of weather and that he also again faxed a copy of the newspaper article to Anderson. In reaching the conclusion it did, the trial court could only have impermissibly weighed the evidence or judged credibility. This is improper at the summary judgment stage of a proceeding. Clearly, given the evidence in the record, a genuine issue of material fact existed as to when Krautsack first made contact with Anderson about the weather. Accordingly, we find that the trial court erred in granting summary judgment.

Additionally, we believe that Krautsack presented some evidentiary facts in support of his consumer fraud claim, either with respect to concealment of material information or in connection with an affirmative act on the part of Anderson to deceive him.

While the failure to disclose or concealment of material information by a travel agent, based on the agent's fiduciary duty to his clients, is a novel and uncommon theory, it is not, however, unheard of. Nonetheless, there is very little case law in Illinois and across the nation with respect to a travel agent's fiduciary duties to a client. This "paucity" of precedent has been noted by several courts. See *Rosen v. DePorter-Butterworth Tours, Inc.*, 62 Ill. App. 3d 762, 770, 379 N.E.2d 407 (1978) (Stouder, J., dissenting) ("We are not involved here with an area of law which has been extensively reported and therefore the defendant's duties as a special agent in this particular factual setting are not well defined"). See also *Lyall v. Airtran Airlines, Inc.*, 109 F. Supp. 2d 365, 369 (E.D. Pa. 2000) (noting paucity of precedent on travel agent's duties); *Loretti v. Holiday Inns, Inc.*, No. 85—0709, slip op. at ___ (E.D. Pa. 1986) ("The scope and nature of the duty which a travel agent owes to its client has neither been considered by many courts nor singularly defined by those courts which have considered the issue").

However, one Illinois case has specifically addressed the issue. In *United Airlines, Inc. v. Lerner*, 87 Ill. App. 3d 801, 410 N.E.2d 225 (1980), the court set forth general rules with respect to a travel agent's duty, as follows:

> "A travel agent is a special agent, akin to a broker, which engages in a single business transaction with the principal. [Citation.] Like every agent, the travel agent owes duties of service and due care to the principal. While there is no duty of investigation, the travel

agent must disclose all information the agent learns which is material to the object of the agency. [Citation.] Likewise, all travel agents owe a duty of loyalty to their principals." *United Airlines, Inc.*, 87 Ill. App. 3d at 803-04.

However, the court also stated that "the law requires only that agents be loyal, not prescient." *United Airlines, Inc.*, 87 Ill. App. 3d at 804. Accordingly, an agent is not required to advise a client of "possible hindrances to his vacation." (Emphasis omitted.) *United Airlines, Inc.*, 87 Ill. App. 3d at 804.

■ Similarly, courts in other jurisdictions have set forth the following general principles. In Pennsylvania, a travel agent has a duty to use reasonable skill and effort to ascertain crucial facts. *Slade v. Cheung & Risser Enterprises, Inc.*, 10 Pa. D. & C.3d 627, 635 (Pa. Com. Pl. 1979) (trial court decision). Additionally, under Pennsylvania law, a travel agent has some duty to disclose reasonably obtainable material information unless that information is so obvious to the client. *Lyall*, 109 F. Supp. 2d at 370. Another jurisdiction requires a travel agent to investigate "destinations, suppliers and tour operators and to convey needed and relevant information to consumers." *Pellegrini v. Landmark Travel Group*, 165 Misc. 2d 589, 592, 628 N.Y.S.2d 1003, 1006 (1995) (failure of travel agent to determine the availability of tour as promised and to inform the client that tickets were nonrefundable constituted a breach of the agent's fiduciary duty). Accordingly, a travel agent should be "expected to provide information which is necessary and of importance to the traveler." *Levin v. Kasmir World Travel, Inc.*, 143 Misc. 2d 245, 247, 540 N.Y.S.2d 639, 641 (1989). Another court has stated that the agency relationship between an agent and his customer " 'impose[s] a duty to promptly communicate to [the] principals confirmations and all other relevant information about the proposed travel plans and tours which would help them protect themselves from harm and loss.' [Citation.]" *Maurer v. Cerkvenik-Anderson Travel, Inc.*, 181 Ariz. 294, 296, 890 P.2d 69, 71 (App. 1994). This includes the duty to disclose known dangers. *Maurer*, 181 Ariz. at 296, 890 P.2d at 71. See also *Markland v. Travel Travel Southfield, Inc.*, 810 S.W.2d 81, 84 (Mo. App. 1991) (a travel agent has a duty to use a reasonable effort to apprise a customer of information material to the agency that the travel agent has notice the customer would desire). The duty to disclose in Arizona, however, is not unlimited. In *Maurer*, the court stated:

" 'The scope of this duty of disclosure will be limited, naturally, to what is reasonable in any given instance. A travel agent is not an insurer, nor can he be reasonably expected to divine and forewarn of an innumerable litany of tragedies and dangers inherent in

foreign travel.' [Citation.]" *Maurer*, 181 Ariz. at 297, 890 P.2d at 72.

In this regard, Pennsylvania has held that "[a] travel agent cannot reasonably be expected to guarantee that a traveler will have a good time or will return home without having experienced an adverse adventure or harm." *Loretti*, slip op. at ___.

■ We conclude, based on the above general principles, and given the agent's relationship with his client and his duty of loyalty, that if an agent has a conflict of interest or some interest that would be adverse to the client or affect the client's decision, the agent must disclose that fact to the client. In the instant case, genuine issues of material fact existed as to whether Anderson failed to disclose any information that was material to the object of the agency relationship between Krautsack and Anderson. Specifically, *inter alia*, a question existed as to whether Anderson's financial interest or motive was material to that agency. Moreover, we believe that both of Anderson's e-mails offered by Krautsack created a fact question as to whether Anderson "pushed" Krautsack into proceeding with the trip. In addition, the question remains as to whether such "pushing" could reasonably be interpreted to constitute an affirmative deceptive act under the Consumer Fraud Act.

Accordingly, we find that summary judgment on Krautsack's consumer fraud counts was improperly granted.

## II. Breach of Contract (Count III)

Krautsack next contends that the trial court erred in granting summary judgment on his breach of contract claim because the "Act of God" clause contained in the document provided by Anderson, which Krautsack signed, does not excuse Anderson and Luxury Adventures' conduct. According to Krautsack, the document he signed is not the entire contract between the parties; the contract between the parties is partly oral. Specifically, according to Krautsack, the timing of the trip, during the "dry season," was part of the oral agreement between the parties. Krautsack argues that Anderson and Luxury Adventures were obligated to provide a trip during the dry season and that because he had no dry weather at all during his trip, he was not provided the consideration for which he paid. Krautsack further argues that the "Act of God" clause is not a defense to his breach of contract claim because his claim is not based on bad weather but, rather, on Anderson and Luxury Adventures' failure to provide the consideration for which he paid. Specifically, Krautsack argues that Anderson and Luxury Adventures breached the contract by failing to deliver the promised consideration, *i.e.*, a trip during the dry season,

and it was within their ability to postpone the trip—not within God's ability.

Anderson and Luxury Adventures contend that Krautsack signed a contract that unambiguously and specifically stated that Anderson and Luxury Adventures would not be liable for the weather. Accordingly, they maintain that the trial court correctly held that Krautsack's argument that the "Act of God" clause was not applicable was "utterly ridiculous." Anderson and Luxury Adventures also argue that the contract did not provide for postponement of the safari. Lastly, Anderson and Luxury Adventures maintain that the term "dry season" is contained nowhere in the contract and that Krautsack failed to present any evidence that he did not travel during the dry season.

In response, Krautsack reiterates that the document was not the complete contract and that oral testimony was necessary to fill in certain blanks. Krautsack also argues that the contract applied only to cancellation of the trip and not to postponement.

■ Resolution of this claim turns upon the terms of the agreement between the parties. The law with respect to contract interpretation is well settled. As the court stated in *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 757 N.E.2d 952 (2001):

> "[W]hen construing a contract, [a court] should ascertain the intent of the parties and give effect to that intent. [Citation.] ***
>
> > ' "[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." [Citation.]' *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999).
>
> The *Air Safety* court noted that this approach has been referred to as the 'four corners' rule. [Citation.] The 'four corners' rule has been described as related, although not identical, to the parol evidence rule. [Citation.] The parol evidence rule has been explained as follows: '[The parole evidence] rule generally precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms.' [Citation.] *** A party may not introduce parol or extrinsic evidence to show additional consistent terms of a contract unless the writing is incomplete or ambiguous." *Eichengreen*, 325 Ill. App. 3d at 521-22.

A court may only consider the writing itself in determining whether a contract is complete and integrated. *Eichengreen*, 325 Ill. App. 3d at 523. See also *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill. 2d 265, 271, 642 N.E.2d 1215 (1994). " 'If [the document] imports

on its face to be a complete expression of the whole agreement,—that is, contains such language as imports a complete legal obligation,—it is to be presumed that the parties introduced into it every material item and term, and parol evidence cannot be admitted to add another term to the agreement ***.' [Citation.]" *Eichengreen*, 325 Ill. App. 3d at 523. However, where a contract is not clearly, on its face, complete, "the parole evidence rule [does] not preclude the plaintiff 'from offering proof of terms allegedly agreed to *** that [were] consistent with and would supplement, but not contradict, [the contract.]' [Citation.]" *Eichengreen*, 325 Ill. App. 3d at 524. See also *Weber v. De Kalb Corp.*, 265 Ill. App. 3d 512, 518, 637 N.E.2d 694 (1994). Thus, the threshold inquiry is whether a writing is integrated. *Eichengreen*, 325 Ill. App. 3d at 524. See also *J&B Steel Contractors, Inc. v. C Iber & Sons, Inc.*, 246 Ill. App. 3d 523, 528, 617 N.E.2d 405 (1993). In other words, was the document "intended by the parties to be a final and complete expression of the entire agreement." *J&B Steel Contractors*, 246 Ill. App. 3d at 528. Courts must determine from the four corners of the document itself whether the contract is incomplete. *Weber*, 265 Ill. App. 3d at 518.

Initially, we note that neither Anderson nor anyone on behalf of Luxury Adventures signed the document offered as the contract in the instant case. Although Anderson and Luxury Adventures emphatically stated at oral argument before this court that there was a second page to the contract, this assertion is not supported by the record. We located at least seven copies of the contract in the record and all consisted of a single page apparently signed and dated by Krautsack. These include those copies offered by Anderson and Luxury Adventures as attachments to various pleadings. Moreover, Krautsack's counsel stated that he was not aware of a second page, nor had he ever seen one. We therefore question Anderson and Luxury Adventures' counsel's statements in this respect.

Additionally, although the document appears to have been dated by Krautsack, the date is illegible. Thus, it is impossible to ascertain whether any alleged other terms, pursuant to conversations between Krautsack and Anderson or Luxury Adventures, were before, contemporaneous to the time, or after the document was signed. This may be important since the terms of a written contract may be modified by subsequent oral agreement. *Tadros v. Kuzmak*, 277 Ill. App. 3d 301, 312, 660 N.E.2d 162 (1995).

In any event, we agree with Krautsack that the one-page document present in the record that he signed is not the entire contract between the parties. To be enforceable, an agreement must be sufficiently definite so that the terms of the agreement are reasonably

certain and able to be determined. *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 979, 684 N.E.2d 816 (1997). In the instant case, many essential terms, other than those offered by Krautsack, are not contained in the document. While it can be presumed that Krautsack was to travel to Africa because the document referred to "safari," the document does not state where in Africa, even generally, *e.g.*, the north, south, east, or west regions of Africa, let alone specific destinations. Additionally, the document does not specify a price or cost for the travel. Similarly, as noted above, the document was not signed by Anderson or someone on Luxury Adventures' behalf. Lastly, and perhaps most importantly, the document does not disclose the dates of travel. All of these terms would be essential to the agreement between the parties. Without these specifics, the contract has no object, there is no consideration, and it would not be enforceable. Accordingly, we find that genuine issues of material fact existed as to the terms of the contract between the parties, thereby precluding summary judgment.

Moreover, we believe that Anderson's e-mail could reasonably be interpreted to be an acknowledgment or admission by Anderson that he knew he had breached the contract with Krautsack. Clearly, Anderson admitted in that e-mail that Krautsack did not get the trip for which he had paid. In other words, Krautsack may not have received the consideration for which he had paid. This e-mail was sufficient evidence to allow the matter to proceed to the trier of fact and was sufficient to preclude summary judgment.

### III. Propriety of Striking Krautsack's Motion for Reconsideration

Krautsack next contends that the trial court erred in striking his motion for reconsideration of its order granting summary judgment because the 30-day period in section 2—1203 of the Code of Civil Procedure (735 ILCS 5/2—1203 (West 1998)) commences only upon entry of a final judgment; it does not commence upon entry of an interlocutory order such as the one granting summary judgment to Anderson and Luxury Adventures in the instant case.

In light of the fact that we are reversing the trial court's order granting summary judgment, we need not address this issue.

### IV. Propriety of Attorney Fees and Costs

#### A. Pursuant to Rule 137

Krautsack next contends that the trial court erred in assessing sanctions against him pursuant to Rule 137. 155 Ill. 2d R. 137. According to him, the record does not support any Rule 137 findings. Anderson and Luxury Adventures contend that sanctions were appropriate because Krautsack, through his attorney, filed false. plead-

ings, failed to present any good-faith argument or basis in fact or law to support Krautsack's position, and filed a frivolous lawsuit since there was no legitimate basis for holding a travel agent liable for the weather. Anderson and Luxury Adventures further maintain that the trial court erred in failing to hold Krautsack's counsel liable as well as Krautsack.

Pursuant to Rule 137, the trial court may impose sanctions against a party or his counsel for filing a motion or pleading that is not well grounded in fact, not supported by existing law, or lacks a good-faith basis for modification, reversal, or extension of the law, or is interposed for any improper purpose. *Peterson v. Randhava*, 313 Ill. App. 3d 1, 6-7, 729 N.E.2d 75 (2000). The rules with respect to imposition of sanctions pursuant to Rule 137 are well settled. The purpose of sanctions under Rule 137 is to prevent the filing of false or frivolous lawsuits. *Peterson*, 313 Ill. App. 3d at 7. "To this end, the rule is designed to prohibit the abuse of the judicial process by claimants who make vexatious and harassing claims based upon unsupported allegations of fact or law. [Citation.] However, the rule is not intended to penalize litigants and their attorneys merely because they were zealous, yet unsuccessful." *Peterson*, 313 Ill. App. 3d at 7. Thus, Rule 137 is penal in nature and must be strictly construed. *Technology Innovation Center, Inc. v. Advanced Multiuser Technologies, Corp.*, 315 Ill. App. 3d 238, 244, 732 N.E.2d 1129 (2000). The trial court, however, "should not impose sanctions on a party who presents objectively reasonable arguments for his position, regardless of whether the arguments are deemed to be unpersuasive or incorrect." *McClaughry v. Village of Antioch*, 296 Ill. App. 3d 636, 645, 695 N.E.2d 492 (1998). Although we review a trial court's decision for an abuse of discretion, we are not precluded from "independently reviewing the record and finding an abuse of discretion if the facts warrant." *Technology Innovation Center, Inc.*, 315 Ill. App. 3d at 244. "When reviewing a decision on a motion for sanctions, the primary consideration is whether the trial court's decision was informed, based on valid reasoning, and follows logically from the facts." *Technology Innovation Center, Inc.*, 315 Ill. App. 3d at 244.

Initially, the trial court here found that Krautsack, not his counsel, violated Rule 137 in eight ways, and it assessed sanctions only against Krautsack. It is difficult to understand from the record, particularly since there is no report of proceedings from the sanction hearings, why the trial court did not sanction Krautsack's counsel. This is especially true with respect to the alleged violations based on legal argument and allegations in the pleadings that are based on legal arguments. It was Krautsack's counsel, presumably and logically, who

developed these arguments and presented them to the court—not Krautsack. There is no evidence Krautsack is an attorney and no evidence he was capable of creating such arguments. As such, any sanctions, if proper, should, at the least, also have been placed against Krautsack's counsel. Our independent research has disclosed no cases imposing sanctions on a party only, except where the party is *pro se*, and this is done only in extraordinary circumstances. In any event, because we have concluded above that Krautsack's causes of action survived summary judgment, we find that the Rule 137 sanctions were not warranted and, therefore, the trial court abused its discretion in imposing them.

B. Attorney Fees and Costs Pursuant to the Consumer Fraud Act

Krautsack contends that the trial court erred in awarding attorney fees and costs to Anderson and Luxury Adventures pursuant to the Consumer Fraud Act because the record fails to disclose any bad faith on his part.

Anderson and Luxury Adventures contend that recovery of attorney fees and costs is not limited to a showing of bad faith and that other factors are relevant. They further maintain that bad faith was established based on the trial court's finding that Krautsack's lawsuit was frivolous, as well as the fact that the trial court entered a Rule 137 order, which is equivalent to a finding that Krautsack acted in bad faith.

Section 10a(c) of the Consumer Fraud Act allows the trial court to award "reasonable attorney's fees and costs to the prevailing party." 815 ILCS 505/10a(c) (West 1998). A different standard applies to cases where a defendant seeks attorney fees and costs than the standard applicable when a plaintiff seeks the same. *Casey v. Jerry Yusim Nissan, Inc.*, 296 Ill. App. 3d 102, 107, 694 N.E.2d 206 (1998); *Haskell v. Blumthal*, 204 Ill. App. 3d 596, 602, 561 N.E.2d 1315 (1990). In determining whether to award attorney fees and costs, the trial court should consider the following factors:

"(1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of fees; (3) whether an award of fees against the opposing party might deter others from acting under similar circumstances; (4) whether the party seeking fees sought to benefit all consumers or businesses or to resolve a significant legal question regarding the act in question; and (5) the relative merits of the parties' positions." *First Chicago Gary-Wheaton Bank v. Gaughan*, 275 Ill. App. 3d 53, 62-63, 655 N.E.2d 936 (1995).

These factors are consistent with Rule 137. *Miller v. Bizzell*, 311 Ill. App. 3d 971, 975, 726 N.E.2d 175 (2000). Bad faith is a "pivotal fac-

tor," and perhaps controlling, in allowing fees to a defendant since the purpose of the Consumer Fraud Act is to protect consumers. See *Casey*, 296 Ill. App. 3d at 108; *Washington Courte Condominium Ass'n-Four v. Washington-Golf Corp.*, 267 Ill. App. 3d 790, 826, 643 N.E.2d 199 (1994); *Graunke v. Elmhurst Chrysler Plymouth Volvo, Inc.*, 247 Ill. App. 3d 1015, 1023, 617 N.E.2d 858 (1993). See also *Miller*, 311 Ill. App. 3d at 975 ("We [have] difficulty envisioning a circumstance arising under the Consumer Fraud and Deceptive Business Practices Act [citation] where fees should be awarded to a defendant who simply prevailed, absent bad faith on the part of the plaintiff"). Based on the above principles, "a trial court must first determine whether the plaintiff acted in bad faith." *Casey*, 296 Ill. App. 3d at 108. Again, Rule 137 provides the proper standard for bad faith, *i.e.*, "whether the knowledge, information, and belief in the plaintiff's pleadings are not ' "warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law," and whether they are "interposed *** to harass or to cause unnecessary delay." ' [Citation.]" *Casey*, 296 Ill. App. 3d at 108. If the trial court finds bad faith under this standard, it should then proceed to analyze the remaining factors enumerated above. *Casey*, 296 Ill. App. 3d at 108.

█ In the instant case, the trial court found that Krautsack violated Rule 137 and, therefore, pursuant to the above principles, we can infer that it found bad faith. However, based on our conclusion above that Rule 137 sanctions were not appropriate, no basis exists any more for the trial court's finding of a violation of Rule 137 and, therefore, no basis for awarding attorney fees and costs under section 10a(c) without making additional specific findings since no inference of bad faith existed. Accordingly, we conclude that, on the state of the record as it presently stands, there was no basis for awarding attorney fees and costs pursuant to the Consumer Fraud Act.

### C. Attorney Fee and Costs Petition Issues

█ Krautsack also contends that Anderson and Luxury Adventures' petition for attorney fees and costs was deficient because it failed to differentiate between the time spent on the consumer fraud claim and the time spent on the breach of contract claim, and that the petition overstated Anderson and Luxury Adventures' counsel's fees and costs. Based on our resolution above that attorney fees and costs were not warranted, we need not address these two contentions.

### V. Rule 375 Attorney Fees and Costs

█ Anderson and Luxury Adventures ask this court to award appellate attorney fees and costs pursuant to Rule 375(b) (155 Ill. 2d R. 375(b)). Pursuant to Rule 375(b), we may award attorney fees and

costs where an appeal is frivolous, not taken in good faith, or taken for an improper purpose.

We conclude that this appeal is not frivolous, lacking in good faith, or otherwise improper and deny attorney fees and costs to Anderson and Luxury Adventures. *Brown & Kerr, Inc. v. American Stores Properties, Inc.*, 306 Ill. App. 3d 1023, 1035, 715 N.E.2d 804 (1999).

## CONCLUSION

For the reasons stated, we reverse the judgment of the circuit court of Cook County and remand this cause for further proceedings consistent with this opinion.

Reversed and remanded.

CAHILL and McBRIDE, JJ., concur.