EMERSON ELECTRIC COMPANY *et al.*, Plaintiffs-Appellants, v. AETNA CASUALTY AND SURETY COMPANY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—02—3661

Opinion filed August 30, 2004.

Stephan G. Weil, Mark H. Kolman, Keisha A. Gary, and Erica J. Dominitz, all of Dickstein, Shapiro, Morin & Oshinsky, L.L.P., of Washington, D.C., and Kevin M. Forde, of Kevin M. Forde, Ltd., of Chicago, for appellants.

Maria G. Enriquez and Nina Markoutsis, both of Bates & Carey, of Chicago, for appellee Republic Insurance Company.

JUSTICE GORDON delivered the opinion of the court:

This appeal arises from ongoing complex litigation pending in the circuit court of Cook County. In 1993, Emerson Electric Co. (Emerson)

and 15 of its subsidiaries brought an action for declaratory judgment[1] against 57 separate insurance carriers. Plaintiffs sought a determination that the insurers owed them coverage under comprehensive general liability (CGL) insurance policies purchased by Emerson for liabilities incurred as a result of damage to the environment at 64 sites located in 26 different states. The numbers of parties and sites have since been reduced, primarily through settlements and dismissals.[2] Republic Insurance Company (Republic) is the only insurer party to this appeal.[3]

In January of 2001, we considered an earlier appeal brought by plaintiffs and found that Missouri law applies to the interpretation of the insurance policies at issue.[4] Our ruling, in relevant part, reversed an interlocutory order in favor of Republic concerning the site in Hatfield, Pennsylvania, reversed certain grants of summary judgment in favor of Republic concerning plaintiffs' claims for coverage with respect to sites in Maysville, Kentucky; Erie and York, Pennsylvania; and Dixiana, South Carolina, and remanded the matter for further proceedings.

On remand, the trial court regranted summary judgments in favor of Republic with respect to plaintiffs' claims for coverage for polluted sites located in Erie and Hatfield, Pennsylvania, and Dixiana, South Carolina. The court also granted summary judgments in favor of Republic with respect to polluted sites not implicated in the prior appeal, which were located in Vernon, Alabama; Shreveport, Louisiana; Philadelphia, Mississippi; and Melville, New York. Plaintiff Emerson and its subsidiaries, Ridge Tool Company, Therm-O-Disc Inc., Wiegand Appliance, Poulan/Weed Eater, U.S. Electrical Motors, McPhilben Lighting Company and Brooks Instruments (hereinafter referred to collectively as plaintiffs), now appeal. For the reasons that follow, we affirm in part, and reverse and remand in part.

## BACKGROUND

The facts of this case were set out in detail in our opinion deciding the previous appeal in this matter in *Emerson Electric Co. v. Aetna*

---

[1]The cause has since been transferred to the law division.

[2]Immediately prior to the entry of the orders from which this appeal is taken, there remained nine plaintiffs and seven defendants, with plaintiffs' claims relating to 40 sites in 20 states.

[3]On June 13, 2003, Home Insurance Company (Home), whose policies are also implicated in this appeal, was declared insolvent. On August 14, 2003, we granted Home's motion to abate and/or enjoin appeal and permanently enjoined plaintiffs from continuing this appeal as to Home.

[4]*Emerson Electric Co. v. Aetna Casualty & Surety Co.*, 319 Ill. App. 3d 218, 743 N.E.2d 629 (2001).

*Casualty & Surety Co.*, 319 Ill. App. 3d 218, 743 N.E.2d 629 (2001) (hereinafter *Emerson I*). Therefore, we will only focus on the facts relevant to this appeal.

There are two categories of polluted sites at issue on this appeal: (1) two third-party waste disposal sites (third-party sites or waste disposal sites), with respect to which plaintiffs are seeking insurance coverage for costs associated with investigation and remediation of the sites, and (2) five sites owned by plaintiffs (owned sites), with respect to which plaintiffs are seeking insurance coverage for pollution arising out of manufacturing activities.

Republic had issued two excess CGL policies to Emerson in connection with those sites. Policy No. CDU15502 (the 1983-84 policy) was effective from November 1, 1983, to November 1, 1984, and Policy No. CDU16724 (the 1984-85 policy) was effective from November 1, 1984, to November 1, 1985. The 1983-84 policy contains the following relevant language:

"I. COVERAGES:

To indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed upon him by law or liability assumed by him under contract or agreement for damages, and expenses, all as included in the definition of 'ultimate net loss,' because of:

\*\*\*

(b) [p]roperty damage \*\*\* as defined herein and caused by or arising out of an occurrence[.]

II. DEFINITIONS:

\* \* \*

10. Occurrence.

The term 'occurrence' shall mean (a) an accident, or (b) an event, or continuous or repeated exposure to conditions, which results during the policy period, in personal injury, property damage, or advertising liability \*\*\* neither expected nor intended from the standpoint of the Insured.

POLLUTION EXCLUSION

It is agreed that this policy does not apply to liability for personal injury or property damage arising out of the discharge, dispersal, release, escape or seepage of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, *unless such discharge, dispersal, release or escape is accidental.*" (Emphasis added.)

With respect to the foregoing pollution exclusion, Emerson had requested and paid consideration for deletion of the words "sudden

and" from the standard-form "sudden and accidental" exception to that exclusion, resulting in the language stated above in italics, which only utilizes the term "accidental." The 1984-85 policy contains the same relevant language as the 1983-84 policy, with the only difference being that its exception to the pollution exclusion contains the standard-form language "sudden and accidental."

In *Emerson I*, we held, in pertinent part, that: (1) Missouri law must be applied to determine defendants' coverage obligations regardless of the location of the site; (2) under Missouri law, the standard-form "sudden and accidental" language of the exception to the pollution exclusion means both abrupt and unexpected and precludes coverage for property damage caused by gradual, nonabrupt releases of pollutants; (3) under Missouri law, the amended "accidental" language of the exception to the pollution exclusion means unexpected and does not preclude coverage for property damage caused by gradual, nonabrupt releases of pollutants; (4) under Missouri law, in determining whether the pollution was accidental, the focus is on the resulting damage, as opposed to the initial discharge or shipment of pollutants, and whether the resulting damage was intentional; and (5) under Missouri law, plaintiffs' showing of an "exposure to conditions" resulting in continuing damage to property during the policy period satisfies the initial burden of proving an "occurrence,"[5] as defined in the policies at issue; plaintiffs need not identify a specific event or release which caused the exposure to conditions. *Emerson I*, 319 Ill. App. 3d at 241, 243, 244-46, 253-54, 743 N.E.2d at 646, 647, 648-50, 655. As noted, the matter was remanded for further proceedings.

On remand, the trial court granted summary judgments in favor of Republic concerning the two third-party waste disposal sites based on the lack of "occurrence" as it is defined in the 1983-84 policy,[6] discussed more fully below. The court also granted summary judgments in favor of Republic concerning the owned sites based on the

[5]More precisely, we held that as long as plaintiffs can prove an "exposure to conditions" component of the definition of "occurrence," they were not required to identify a specific event or release which caused the exposure. However, as discussed in detail below, such a showing, by itself, is not sufficient to prove an "occurrence" because, under the express language of the policy, plaintiffs have to further show that the "exposure to conditions" was unexpected and unintended.

[6]Because of our holding in *Emerson I* that under Missouri law, the standard-form "sudden and accidental" exception to the pollution exclusion precludes coverage for property damage caused by gradual, non-abrupt releases of pollutants, plaintiffs are precluded from coverage of gradual pollution at the third-party sites under the 1984-85 policy.

1984-85 policy's standard-form "sudden and accidental" exception to the pollution exclusion and the 1983-84 policy's customized "accidental" exception to the pollution exclusion, as detailed, respectively, below. Notably, in granting summary judgments with respect to the owned sites, the trial court, in contrast to its focus in determining coverage as to the third-party sites, did not look to the definition of "occurrence" but, rather, looked to the language of the pollution exclusion as precluding coverage because it found the pollution at the owned sites not "accidental," irrespective of whether or not the discharges were "sudden."

### The Third-Party Sites' "No Occurrence" Judgments

Plaintiffs moved for partial summary judgment on the issue of coverage under the 1983-84 policy with respect to the liabilities for the Pennsylvania and South Carolina third-party sites. In response, Republic cross-moved for summary judgment on the basis of several defenses, one of which being that plaintiffs either expected or intended the damage at the two third-party sites. The essential facts concerning each third-party site are as follows.

### 1. The Erie, Pennsylvania, Waste Disposal Site

From 1973 to 1981, Urick Foundry (Urick), a division of Emerson's Ridge Tool Company (Ridge Tool) located in Erie, Pennsylvania, hired a licensed local hauler, Sitter Trucking Company (Sitter), to dispose of Urick's foundry sand and other nonhazardous wastes at an off-site location to be selected by Sitter. Plaintiffs offered evidence that Urick expected and intended that Sitter would dispose of the wastes at a proper disposal facility and did not expect or intend the wastes to be discharged from a disposal facility or to cause damage to the environment.

However, Sitter commingled Urick's foundry sand along with other companies' wastes and improperly disposed of the wastes at the Erie, Pennsylvania, site, an unlicensed landfill owned in part by Sitter. Plaintiffs offered evidence that Sitter's actions were unknown to Urick and contrary to its expectation and intention, that Sitter did not inform Urick that it was hauling Urick's foundry sand to the site, and that none of the shipping records indicate where Sitter was hauling the sand.

The landfill in question, known as the Millcreek Landfill, was operated from 1941 until it was closed by the State of Pennsylvania in 1981, subsequent to the state's discovery that it was being illegally operated. In 1982, pursuant to its Superfund authority, the United States Environmental Protection Agency (the EPA) conducted an investigation of soil, sediment, groundwater and surface water

contamination at the site. The tests confirmed soil and groundwater contamination.

At or about the same time, a neighboring landowner, Ralph Riehl, filed a lawsuit against plaintiffs and other potentially responsible parties. In 1983, the Millcreek Landfill was proposed to the EPA's National Priorities List.[7] On September 16, 1983, Urick received a notice of potential liability (PRP letter) from the EPA. On September 30, 1983, the law firm of MacDonald, Illig, Jones & Britton responded to the EPA's PRP letter by acknowledging that the firm represented Urick in conjunction with the Millcreek site. On October 2, 1983, the law firm, acting on behalf of Urick and other potentially responsible parties, participated in a conference with the EPA regarding the investigation and cleanup at the Millcreek Landfill.

In June of 1992, the EPA sued Urick pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 *et seq.* (1988)), seeking recovery of costs expended to investigate and remediate the site. Subsequently, in 1993, the Pennsylvania Department of Environmental Resources (PADER) also sued Urick concerning the contamination at the site. Urick settled those suits in 1996.

### 2. The South Carolina Waste Disposal Site

The facts relating to the Dixiana, South Carolina, site are similar to those relating to the Erie, Pennsylvania, site. On approximately 10 occasions between April of 1978 and March of 1980, South Carolina Recycling and Disposal, Inc. (SCRDI), a licensed hauler, removed chemical wastes from Emerson's former manufacturing facility, Therm-O-Disc Incorporated (Therm-O-Disc), in Aiken, South Carolina. Plaintiffs offered evidence that Therm-O-Disc expected SCRDI to dispose of the wastes properly and did not expect or intend the wastes to be discharged from a disposal facility or to damage the environment.

Plaintiffs offered evidence that, unbeknownst to Therm-O-Disc and contrary to its expectations and intentions, SCRDI stored and handled Therm-O-Disc's wastes improperly at the waste disposal site. Between 1978 and 1980, SCRDI stored more than 1,100 drums containing various types of wastes at the site; many of the drums deteriorated and leaked as a result of SCRDI's allegedly improper handling practices. The EPA confirmed groundwater contamination at the site between 1980 and 1982, leading to the site's placement on the

---

[7]The National Priorities List is the EPA's list of the most serious sites of *known or threatened releases of hazardous substances, pollutants, or contaminants* throughout the United States.

National Priorities List in December of 1982. The EPA and state environmental officials investigated the site from 1984 to 1986 and ultimately concluded that contamination was migrating through the groundwater underneath the site.

In December of 1988, the EPA sent Therm-O-Disc an information request concerning the site. By a letter dated February 14, 1989, the EPA demanded that Therm-O-Disc reimburse it for its costs associated with investigation and remediation of the site. The EPA alleged that Therm-O-Disc sent drums to the site and that releases from those drums caused or contributed to the contamination of the site. Subsequently, in April of 1992, pursuant to CERCLA, the EPA sued Therm-O-Disc and two other companies that allegedly shipped material to the site. In January of 1995, Therm-O-Disc settled with the EPA and agreed, as part of the settlement, to reimburse the government for past costs to a certain date and to take over operation and maintenance of the site's groundwater remediation system.

### Trial Court's Judgments With Respect to the Third-Party Waste Disposal Sites

In opposition to plaintiffs' motions for summary judgment and in support of its own motions for summary judgment, Republic argued, in part, that plaintiffs failed to prove a covered "occurrence" because they were aware of the property damage at the two third-party sites prior to the inception of the 1983-84 policy. Plaintiffs responded to Republic's cross-motion with evidence that disputed the accuracy and relevance of Republic's evidence and the inferences which Republic drew from that evidence.

On August 29, 2002, the trial court denied plaintiffs' motions for partial summary judgment and granted Republic's cross-motions. The trial court found that plaintiffs had failed to demonstrate a covered "occurrence" at either site because they "expected and intended," prior to the inception of the policy, the property damage that took place at the two sites.

### The Owned Sites' "Intentional Pollution" Judgments

Republic moved for summary judgment on the issue of coverage for owned sites located in Alabama, Louisiana, Mississippi, and New York, based on the inapplicability of the "sudden and accidental" exception to the pollution exclusion contained in the 1984-85 policy. Republic similarly moved for summary judgment on the issue of coverage with respect to those four sites and cross-moved for summary judgment in conjunction with its opposition to plaintiffs' motion for

partial summary judgment as to the Hatfield, Pennsylvania, site,[8] based on the inapplicability of the customized "accidental" exception to the pollution exclusion contained in the 1983-84 policy. Republic, in essence, argued that the discharges of pollutants were neither "sudden" nor "accidental," thereby precluding coverage. The essential facts concerning each owned site are as follows.

### 1. The Alabama Owned Site

Emerson's Wiegand Appliance Division (Wiegand) built the Vernon, Alabama, facility on undeveloped land in 1976. That facility began operations in 1976 and manufactured electrical resistance heating units.

In 1981, Wiegand constructed a state-licensed concrete storage pad that was designed to hold virgin and waste materials, including oils, trichloroethylene (TCE) and trichloroethane (TCA). The storage pad, surrounded by a concrete curb, contained no passageways, such as pipes or drains, through which chemicals could have traveled to other parts of the site. A grated concrete containment trench was built around the storage pad. The trench was built specifically to contain discharges that otherwise might have been released from the storage pad.

TCA was stored on the storage pad in 55-gallon drums, and TCE was stored in a 5,000-gallon aboveground storage tank. TCE was delivered to the aboveground storage tank via a truck and distributed throughout the plant by an underground pipe.

Sometime in 1981 or 1982, Vernon's coordinator of environmental compliance observed stained soil around the storage pad. The soil was eventually removed and disposed of as hazardous waste. In the mid-1980s, the compliance coordinator also learned that some employees had, on an unspecified number of occasions, poured small amounts of spent TCA onto the ground near the storage pad, as was evidenced by dead grass.

At some point, a sump was constructed in the concrete storage pad to collect rainwater and other materials that would spill onto the storage pad. There was no drain or outlet from the sump. Liquids collected in the sump were periodically pumped out and discharged into a

---

[8]The Hatfield, Pennsylvania, site was a subject of our prior opinion in *Emerson I*. We held that plaintiffs had proven the "exposure to conditions" component of the definition of "occurrence" at that site and were not required to identify a specific event or release which caused the exposure. *Emerson I*, 319 Ill. App. 3d at 253-54, 743 N.E.2d at 655-56. However, as previously noted, having cleared that hurdle, plaintiffs still had to prove that the exposure was unexpected and unintended.

sanitary sewer. Visible staining of the soils showed that the sump may have overflowed in the past. In the event of an overflow, the water from the storage area would flow across an adjacent unpaved area for approximately 40 feet to a paved road. The water would then flow along the curb of the road to the point where the road ended. From the end of the road, the water would flow some 100 yards to a neighboring small creek. Republic alleged that overflows were routine occurrences over the years whenever heavy rains fell, resulting in contaminated water flowing down the road and toward the creek.

In 1988, Wiegand constructed a hazardous waste storage pad adjacent to the concrete storage pad. That hazardous waste storage pad, where spent TCE was stored, did not contain a sump or a trench.

In July of 1989, outside the coverage period of the policies at issue, Emerson's corporate representative conducted an internal environmental compliance audit of the facility. It appears that in his report he stated that he observed a leak in one of the pump seals to the 5,000-gallon TCE aboveground storage tank, a rusted drum containing TCE and other material dripping onto the concrete storage pad, and staining of the concrete storage pad and surrounding soil.

After the audit, in 1990, Emerson retained Radian Corporation (Radian) to conduct an investigation of Wiegand's operations. Radian determined that the staining around the concrete storage pad was due to leakage from the underground pipeline, leakage from an aboveground pipe connected to the pipeline, as well as storm water runoff from the pad. Radian also discovered on-site and off-site soil and groundwater contamination caused by total petroleum hydrocarbons and volatile organic compounds, including TCE and TCA. Although plaintiffs have admitted that the contamination at the Vernon facility was the result of slow leakage over a considerable period of time, plaintiffs claim that longtime Wiegand employees had also identified at least two abrupt, unexpected, and unintended releases of TCE during plant operations, which may have contributed to the contamination at the site. These releases allegedly occurred in 1975 and 1977 or 1978. Republic disputes this claim based on the fact that plaintiffs' corporate representative testified in a deposition that he could not recall any abrupt or accidental discharges having occurred at the Vernon site.

## 2. The Louisiana Owned Site

Emerson's Poulan/Weed Eater Division (Poulan/Weed Eater) manufactured chainsaws and consumer lawn trimmers at its Shreveport, Louisiana, facility from 1971 until 1983. In 1986, Emerson sold Poulan/Weed Eater to White Consolidated Industries (WCI). Subse-

quently, WCI, with the assistance of its environmental consultant, discovered soil and groundwater contamination caused by heavy metals and chlorinated solvents, including TCE and TCA, at the site.

From 1971 to 1980, Poulan/Weed Eater operated a permitted wastewater treatment system that was designed to treat heavy metal and solvent wastes from the facility's manufacturing operations. Waste streams from Poulan/Weed Eater industrial processes contained cyanide, heavy metals and industrial solvents (TCA and TCE). These streams passed through a treatment facility and were separated to create a sludge that, depending on the time period, was directed to one of three industrial waste lagoons. The first lagoon was used from 1971 to 1975, the second lagoon was used from 1975 to 1979, and the third lagoon was used from 1979 to 1980. The lagoons were intended to hold the sludge permanently, while any water remaining in the sludge was intended to evaporate into the atmosphere or to percolate into the subsurface. The remaining treated water was discharged into a sanitary waste lagoon. Wastes from Poulan/Weed Eater's plating operations were sent to a series of underground tanks for treatment and then were pumped into one of the lagoons, where metal sludge would accumulate. On-site settling lagoons were discontinued in August of 1980 and a new continuous wastewater treatment system was installed.

During the years the manufacturing facility was in operation, TCA and TCE were used in a degreasing unit and were kept in an aboveground storage tank located on a concrete pier or slab outside the plant building. That tank was taken out of service and removed in 1983. Acetone was used to clean the chainsaws and was stored in five-gallon cans in an oil storage shed in the back of the plant. Chromic acid was used in the plating operations, and cyanide was used in the heat-treating system. Spent TCA and TCE, as well as acetone and toluene (used during the installation of handlebars on the chainsaws), were stored in an underground storage tank. That tank was removed from the site in 1986. As noted above, used chromates and cyanide were pumped into treatment tanks, and then the sludge was pumped into one of the industrial lagoons.

The principal contaminants discovered at the site were TCA and TCE. The primary source of TCE in the groundwater was identified to be the three industrial waste lagoons. Contamination was also discovered at the location of the aboveground TCA/TCE storage tank, the concrete pier, and the underground solvent waste tank.

Plaintiffs claim that some contamination may have been accidental and point to two separate incidents in 1973 and 1974, when magnesium, used to build chainsaws, spontaneously combusted as a result of

inadvertent contact with water. With respect to the 1973 incident, the combusting magnesium resulted in a large fire and explosion that destroyed a solvent storage area and caused the death of an employee. The 1974 incident occurred in the same general area of the facility as the 1973 incident.

### 3. The Mississippi Owned Site

In 1988, after an internal environmental audit, Emerson retained Radian to investigate the surface impoundment[9] constructed in 1974 by Emerson's U.S. Electrical Motors Division at its Philadelphia, Mississippi, facility. Processed rinsewater from various plant operations was piped to that surface impoundment, where the water would either evaporate or be discharged into the sewer system for the City of Philadelphia. Plaintiffs claim that the impoundment was constructed with a specially lined clay surface. However, the report prepared by Radian states that the impoundment is unlined. Rather, the impoundment sits on top of approximately nine feet of natural clay. Radian's investigation determined that there was soil and groundwater contamination, which was caused by the seepage of wastes through the natural clay bottom of the impoundment.

### 4. The New York Owned Site

Emerson's McPhilben Lighting Company (McPhilben) manufactured industrial lighting fixtures at its Melville, New York, facility from 1963 until 1989, when McPhilben was sold. In preparation for its sale of McPhilben and in compliance with New York law, Emerson hired Radian to perform an environmental audit of the site. Radian discovered that contaminants had escaped into the surrounding soils and groundwater from two underground holding tanks and six dry wells, also called leaching pools, which were intended to hold wastes from plant operations while allowing treated water to escape. Additionally, Radian discovered an area of the facility where xylene, a volatile organic compound, negatively impacted the soil. That contamination arose from a hole that was cut in the bottom of a trench near wastewater tanks. The hole was apparently cut intentionally in order to clean out the pipe running underneath the trench.

### 5. The Pennsylvania Owned Site

From 1964 to 1969, Emerson's Brooks Instruments Division (Brooks) manufactured precision instruments and calibration equip-

---

[9]The EPA defines a surface impoundment as a topographic depression, excavation, or diked area, primarily formed from earthen materials (lined or unlined) and designed to hold accumulated liquid wastes, wastes containing free liquids, or sludges.

ment at a facility located on Church Road near Hatfield, Pennsylvania. In 1987, the EPA named Brooks a potentially responsible party with respect to the site, which had a contaminated aquifer running beneath it. Brooks' use of TCE at its facility allegedly contributed to the contamination of the aquifer. Brooks' longtime employees had no recollection of any spills or releases of TCE taking place at the Church Road facility. There was evidence that plant wastes were discharged through a pipe into an underground storage tank, and liquids from that tank were periodically pumped into the sewer system.

### Trial Court's Judgments With Respect to the Owned Sites

When plaintiffs moved for summary judgment with respect to the Hatfield, Pennsylvania, site, they argued that based on this court's decision in *Emerson I*, plaintiffs had proven an "occurrence" at that site and, in light of the fact that there was no evidence supporting Republic's defenses, Republic was required to provide coverage to Emerson for that site under the 1983-84 policy. Republic cross-moved for summary judgment arguing, in part, that coverage was precluded for the site under the pollution exclusion and the releases of pollutants did not fall within the customized "accidental" exception to the pollution exclusion, *i.e.*, the property damage was not accidental. Emerson responded to Republic's cross-motion contending, in part, that the customized exclusion did not even apply because Republic failed to meet its burden of demonstrating that the property damage at the site was caused by specific nonaccidental releases of pollutants.

With respect to opposing Republic's motions for summary judgment on the issue of coverage for owned sites located in Alabama, Louisiana, Mississippi, and New York, under the customized "accidental" exception to the pollution exclusion contained in the 1983-84 policy and in support of their cross-motion for partial summary judgment on the New York site, plaintiffs argued that property damage at the Alabama, Louisiana, Mississippi and New York owned sites was caused by unintended and unexpected releases of pollutants from permitted containment structures at the sites, and that under this court's decision in *Emerson I*, as well as under Missouri law, the releases were "accidental."

Lastly, in opposition to Republic's motions for summary judgment on the basis that the standard-form exception to the pollution exclusion contained in the 1984-85 policy did not apply, plaintiffs argued that the meaning of the term "sudden," as used in the "sudden and accidental" exception to that exclusion, was an open question under Missouri law, as expressed in the Missouri Court of Appeals' decision in *Trans World Airlines, Inc. v. Associated Aviation Underwriters*, 58 S.W.3d 609, 622 (Mo. App. 2001) (hereinafter, *TWA*):

"No Missouri case has addressed the issue of whether 'sudden and accidental' in pollution exclusion clauses of insurance policies is ambiguous."[10]

Alternatively, even if the term "sudden" were held to mean "abrupt," plaintiffs argued that summary judgment was inappropriate because they had presented evidence of abrupt, unexpected, and unintended releases of pollution with respect to the Alabama and Louisiana sites.

On August 29, 2002, the trial court denied plaintiffs' motion for the Hatfield, Pennsylvania, site and cross-motion for the New York site, and granted Republic's motions and cross-motion concerning all five owned sites. Notably, the court relied on *TWA*, which was decided subsequently to *Emerson I* and which, according to the trial court, focused on whether the *initial discharges* of pollutants were intentional, in contrast to the focus in *Emerson I* on whether the *resulting damage* was intentional. The court held that none of the releases of pollution at any of the owned sites were either "sudden and accidental" or "accidental" because the *discharges* that led to the pollution were not unintended, unexpected, unforseen or abrupt, since such discharges were deliberately carried out as part of plaintiffs' ordinary course of business or routine operations. The court further discounted abrupt releases of chemicals at the Alabama and Louisiana sites as having contributed to the contamination at those sites.

The above grants of summary judgment in favor of Republic are summarized as follows:

## OWNED SITES

| "Sudden and Accidental" Exception to Pollution Exclusion under the 1984-85 Policy (trial court found that releases of pollution were not "sudden and accidental") | "Accidental" Exception to Pollution Exclusion under the 1983-84 Policy (trial court found that releases of pollution were not "accidental") |
|---|---|
| Vernon, Alabama<br>Shreveport, Louisiana<br>Philadelphia, Mississippi<br>Melville, New York | Vernon, Alabama<br>Shreveport, Louisiana<br>Philadelphia, Mississippi<br>Melville, New York<br>Hatfield, Pennsylvania[11] |

---

[10]The *TWA* court, likewise, did not decide that question, having found that, irrespective of whether the term "sudden" must be interpreted with a temporal connotation, the releases were not "accidental."

[11]As noted above, plaintiffs limited their motion as to the Hatfield, Pennsylvania, site to the 1983-84 policy.

## THIRD PARTY SITES

| "Occurrence" under the 1983-84 Policy<br>(trial court found no covered "occurrence" because the damage was<br>"expected and intended") |
| --- |
| Erie, Pennsylvania<br>Dixiana, South Carolina |

Plaintiffs now appeal.

## ANALYSIS

On appeal, plaintiffs contend that the trial court made the following errors of law and/or fact that are reversible under Missouri law:

I. In granting summary judgment with respect to the third-party waste disposal sites:

(a) although the court based its rulings on certain inferences drawn from undisputed facts, other inferences—which support a finding of coverage—could have reasonably been drawn from those same facts;

(b) the court improperly made credibility assessments and weighed the evidence;

(c) the court confused the issue of whether there was an "occurrence," as defined in the 1983-84 policy, which is to be judged by the insured's expectations *at the time the injury-causing acts took place,* with the separate legal issue of whether the loss was insurable or whether it was a known certainty *at the inception of the policy*; and

(d) with respect to whether there was a covered "occurrence," the court misapplied Missouri law, which holds that where, as here, the policy states that it will cover liability arising from property damage that is neither expected nor intended from the standpoint of the insured, a subjective test necessarily governs the "occurrence" analysis.

II. In granting summary judgment with respect to the owned sites:

(a) the trial court's decision is erroneous as a matter of law because the trial court ignored this court's prior ruling in *Emerson I* that, for the purposes of the pollution exclusion, a "release" is the escape of pollutants from, not the intentional deposit of wastes into, places of expected containment;

(b) even if the trial court were not bound by this court's decision in *Emerson I*, its decisions were inconsistent with the plain meaning of the insurance policy and Missouri law, which also provide that a "release" under the pollution exclusion is a discharge from a place of expected containment;

(c) the trial court's rulings, based on the amended "accidental" exception to the pollution exclusion in the 1983-84 policy, that releases at the owned sites could not be "accidental" because they were gradual, contravened both this court's decision in *Emerson I* and the established Missouri law;

(d) there were genuine questions of material fact about the cause of the property damage at the Hatfield, Pennsylvania, and Louisiana sites, which made the grants of summary judgment improper;

(e) the meaning of "sudden," as used in the standard-form "sudden and accidental" exception to the pollution exclusion in the 1984-85 policy, was an unresolved question under Missouri law. In the absence of clear Missouri law, the trial court was required, but failed, to apply Illinois law, which (according to plaintiffs) holds that the terms "sudden and accidental" mean "unexpected and unintended"; and

(f) even if the trial court correctly held that "sudden" means "abrupt" under Missouri law, the court improperly discounted evidence of abrupt and unintended releases of pollutants at the Alabama and Louisiana owned sites, and whether such releases may have contributed to the contamination.

Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2002). Orders granting summary judgment are reviewed *de novo. Rumford v. Countrywide Funding Corp.*, 287 Ill. App. 3d 330, 334, 678 N.E.2d 369, 372 (1997). On appeal from such an order, the reviewing court "must independently examine the evidence presented in support of and in opposition to a motion for summary judgment." *Groce v. South Chicago Community Hospital*, 282 Ill. App. 3d 1004, 1006, 669 N.E.2d 596, 598 (1996). Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment is improper. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992). If, from a review of the pleadings and evidentiary material before the circuit court, this court determines that a material issue of fact exists or that the summary judgment was based upon an erroneous interpretation of the law, a reversal is warranted. *Metropolitan Life Insurance Co. v. American National Bank & Trust Co.*, 288 Ill. App. 3d 760, 765, 682 N.E.2d 72, 75 (1997).

■ Construction of an insurance policy is a question of law and, therefore, may appropriately be disposed of through summary judgment. See *American Standard Insurance Co. v. Allstate Insurance Co.*,

210 Ill. App. 3d 443, 446, 569 N.E.2d 162, 165 (1991). In construing the language of the policy, the court's primary task is "to ascertain and give effect to the intent of the parties to the contract." *Traveler's Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292, 757 N.E.2d 481, 491 (2001). In order to ascertain the meaning of the policy's language and the parties' intent, the court must construe the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Outboard Marine Corp.*, 154 Ill. 2d at 108, 607 N.E.2d at 1212.

Plaintiffs' principal argument on appeal, at least with respect to the owned sites, is that the trial court's reliance on the Missouri Court of Appeals' decision in *TWA*, which, as previously noted, was issued subsequent to *Emerson I*, was erroneous because the trial court was bound by our decision in *Emerson I*. We agree.

■ The law of the case doctrine provides that rulings on points of law made by a court of review are binding in that case upon remand to the trial court and on subsequent appeals to that same reviewing court unless a higher court has changed the law. *Kennedy v. First National Bank of Mattoon*, 259 Ill. App. 3d 560, 563, 631 N.E.2d 813, 815 (1994). The purpose of the doctrine is to protect settled expectations of the parties, ensure uniformity of decisions, maintain consistency during the course of a single case, effectuate proper administration of justice, and bring litigation to an end. 21 C.J.S. *Courts* § 149 (1990). An additional concern addressed by the law of the case doctrine is the maintenance of the prestige of the courts, for the reason that if an appellate court issues contrary opinions on the same issue in the same case, its prestige is undercut. See A. Vestal, *Law of the Case: Single-Suit Preclusion*, 1967 Utah L. Rev. 1. The law of the case doctrine is thus a stone's throw away from the doctrines of *res judicata* and collateral estoppel. See J. Steinman, *Law of the Case: a Judicial Puzzle in Consolidated and Transferred Cases and in Multidistrict Litigation*, 135 U. Pa. L. Rev. 595, 598-99 (1987).

This court is not unaware that the doctrine "allows some flexibility, permitting a court to revisit an issue if an intervening change in the law, or some other special circumstance, warrants reexamining the claim" (*United States v. Thomas*, 11 F.3d 732, 736 (7th Cir. 1993)). However, equally true is the proposition that courts presume case law to be in constant flux and are reluctant to reopen decided issues based on changes in decisional law alone. *Buckley Powder Co. v. State*, 70 P.3d 547, 557 (Colo. App. 2002). In any event, a careful examination of Missouri law to date fails to convincingly support the proposition that the controlling law in Missouri has, in fact, changed since our decision in *Emerson I*.

In *Emerson I*, we addressed the question of which "discharge" or "release" ("into or upon land") is relevant for the purpose of determining the applicability of the standard-form "sudden and accidental" and customized "accidental" exceptions to the pollution exclusion—the initial disposal of a pollutant or the subsequent leakage of the pollutant from the place of disposal. As noted above, we held that the proper focus is on the subsequent migration or leakage, and whether it was expected or intended. We relied on the decision of Missouri's intermediate court of appeals in *White v. Smith*, 440 S.W.2d 497, 504-09 (Mo. App. 1969), and on the persuasive authority of the decision of the District Court for the Eastern District of Missouri in *Aetna Casualty & Surety Co. v. General Dynamics Corp.*, 783 F. Supp. 1199, 1210 (E.D. Mo. 1991) (hereinafter *General Dynamics*), *rev'd in part on other grounds*, 968 F.2d 707 (8th Cir. 1992), both discussed immediately below.

In *White*, which involved an owned site, a slaughterhouse operator intentionally placed blood, offal, and waste material into a nearby lagoon, resulting in the contamination of a neighbor's well. *White*, 440 S.W.2d at 499. In concluding that the damage to the neighbor's well was caused by accident, the Missouri Court of Appeals focused not on the policyholder's initial, intentional placement of the slaughterhouse wastes into the lagoon, but rather on the subsequent migration of those contaminants. *White*, 440 S.W.2d at 510.

In *General Dynamics*, the court analyzed whether the pollution exclusion barred coverage for liability arising from shipping waste to certain landfills and in that context stated:

> "[T]he behavior of the pollutants or their seepage into the ground is accidental if the permeation was unexpected." *General Dynamics*, 783 F. Supp. at 1210.

In our discussion of *General Dynamics* and *White* in *Emerson I*, we stated:

> "[I]t made no difference *** in *White* whether the precipitating *acts causing* the damage were intentional, and it made no difference in *White* whether they were done over a period of time. Similar to *General Dynamics*[ ], the focus in each case is on the resulting damage and whether *it* was intentional." (Emphasis in original.) *Emerson I*, 319 Ill. App. 3d at 245, 743 N.E.2d at 649.

Our analysis and holding in *Emerson I* is further supported by *Superior Equipment Co. v. Maryland Casualty Co.*, 986 S.W.2d 477, 481-83 (Mo. App. 1998), which is a Missouri insurance coverage case concerning liability arising from contamination at a third-party waste disposal facility. In *Superior Equipment*, the policyholder shipped its hazardous wastes to the waste disposal facility that ultimately became

contaminated as a result of spills and leakage from the storage tanks. *Superior Equipment*, 986 S.W.2d at 480-81. The underlying complaint alleged that releases of pollutants had occurred at the site " 'including, but not limited to spills from bulk tanks, leaking drums and tanks, and explosions and resultant leaking from tanks.' " *Superior Equipment*, 986 S.W.2d at 482. The court in that case reversed a grant of summary judgment in favor of the insurers and ruled that they had a duty to defend the policyholder despite the fact that it was uncontroverted that the policyholder had intentionally shipped the wastes to the facility. *Superior Equipment*, 986 S.W.2d at 483. Thus, the court recognized that a mere initial intentional placement of wastes within a facility was not a dispositive factor in determining whether the pollution exclusion precludes coverage.

Republic attempts to relegate the holding of *Superior Equipment* solely to third-party sites and makes the same effort to so restrict our entire holding in *Emerson I* with respect to this issue. We reject this attempt because under the relevant policy language, such a distinction between owned and third-party sites is a distinction without a difference and would be wholly arbitrary. This is evidenced by Republic's inability to cite any cases in support of its proposition or, for that matter, offer cogent reasons why such a distinction would be meaningful. A distinction between owned and third-party sites would be oblivious to the specific language of the policy,[12] which has equal application under either scenario and which, as previously noted, provides:

> "[T]his policy does not apply to liability for personal injury or property damage arising out of the discharge, dispersal, release, escape or seepage of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, unless such discharge, dispersal, release or escape is accidental."

By its plain language, the pollution exclusion under the policy is limited to the "discharge, dispersal, release, escape or seepage" of the pollutant. This language does not distinguish between a policyholder who disposes of waste on-site and a policyholder who instructs another to dispose of waste off-site. Whether the focus is on the initial placement, as urged by Republic, or on subsequent migration, as urged by plaintiffs, the outcome under the construction of this exclusion does not depend on the type of site involved. Under the focus on the initial

---

[12]For the purposes of this analysis, we need not draw a distinction between the standard "sudden and accidental" exception to the pollution exclusion and the customized "accidental" exception.

placement, coverage is precluded for intentional deposits of waste, whether direct, on-site, or vicarious, off-site. Under the focus on subsequent migration, coverage depends on whether the escape of pollutants from the place of their deposit, but without regard to the ownership of the place of deposit, is sudden and accidental (or accidental).

Republic next questions the propriety of adherence to the law of the case in light of the subsequent decision of the Missouri Court of Appeals in *TWA*, discussed in detail below. Republic maintains that *TWA* is the only authoritative case on point decided by a Missouri court. This contention ignores the decision of the Missouri Court of Appeals in *Superior Equipment*, as well as its more broadly applicable analysis in *White*. Republic disagrees with the applicability of the Missouri appellate decision in *White* on the grounds that it focused solely on whether or not the damage was caused by "accident," within the meaning of the policy's coverage, and did not purport to construe the scope of the exception to the pollution exclusion.

The language of the insurance policy in *White* reveals that it, in fact, was an "accident"-based policy issued prior to 1966, before the insurance industry adopted the use of the pollution exclusion. *White*, 440 S.W.2d at 499. The policy provided that it would pay:

> "on behalf of the insured all sums *** which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease . . . and as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the hazards hereinafter defined." (Emphasis omitted.) *White*, 440 S.W.2d at 499.

The court in *White*, consistent with other courts at that time, extended coverage to pollution-related damage, even if it arose from the intentional discharge of pollutants, so long as the ultimate loss was not intended:[13]

> "[W]e *** align ourselves with[ ] the holdings in a larger number of jurisdictions that damages not intentionally inflicted but resulting from an insured's negligence (and thus constructively foreseeable to him) may be 'caused by accident' and within the coverage afforded by a liability insurance policy." *White*, 440 S.W.2d at 508.

Republic argues that the focus in *White*, on whether the resulting property damage was accidental, was dictated by the language of the

---

[13]The court emphasized that " '[t]here is a vast difference between an intended act, and an intended result.' " *White*, 440 S.W.2d at 507, quoting *Murray v. Landenberger*, 5 Ohio App. 2d 294, 299, 215 N.E.2d 412, 415-16 (1966).

policy involved. Republic points out that the language of the pollution exclusion in the instant case provides:

> "[P]olicy does not apply to liability for \*\*\* property damage arising out of the discharge, dispersal, release, escape or seepage of \*\*\* pollutants into or upon land \*\*\* unless such discharge, dispersal, release or escape is \*\*\* accidental."

Republic contends that the very language of the policy here, in contrast with that in *White*, "provides coverage only if the discharge is accidental." The weakness in Republic's argument is highlighted by the very language upon which it relies. The language of the pollution exclusion refers to the discharge, escape, or seepage of pollutants *into or upon land* and denies coverage unless such discharge is accidental. Indeed, as Chief Judge Posner wrote in *Patz v. St. Paul Fire & Marine Insurance Co.*, 15 F.3d 699, 703 (7th Cir. 1994), an "intermediate" interpretation of this clause

> "distinguish[es] between deliberately discharging waste materials into land, air, or water, whether or not 'harm' is intended, and placing those materials in a container that is buried in land or water and subsequently leaks or breaks, discharging waste materials into the land or water surrounding the container."

Similarly, the introduction of wastewater into an evaporation pit, although unlined,

> "is different from just dumping wastes onto land or into a body of water. The discharge of wastes into the environment [does] not occur until the water leache[s] through the bottom of the pit \*\*\*.
>
> This reading of the pollution-exclusion clause, which distinguishes between an intentional act not intended to discharge wastes into the environment and an intentional such discharge, is not inevitable, but it is plausible, and it is consistent with a number \*\*\* of the cases \*\*\*." *Patz*, 15 F.3d at 704.

Therefore, the analysis and holding in *White*, although not dealing with a pollution exclusion specifically, is congruent with the specific policy language used in articulating the pollution exclusion and its exceptions. This is borne out by the fact that *White*'s interpretation was mirrored by the pollution exclusion case of *General Dynamics* (applying Missouri law) and is fully reflected in the holding of the Missouri Court of Appeals itself in *Superior Equipment*.

Republic, nevertheless, argues that *TWA* represents a change in Missouri law and a departure from this analysis. We disagree. Although *TWA* was decided subsequent to our decision in *Emerson I*, it was not decided by Missouri's supreme court and, as such, would in any event be counterbalanced by the decisions of Missouri's intermediate courts of appeals in *Superior Equipment* and *White*. More overridingly, it is unclear, at the very least, what proposition the pertinent

holding of *TWA* stands for. In *TWA*, the insured (TWA) sought coverage for costs incurred in connection with environmental contamination at its facility. At the facility, which was used as a maintenance and repair center for its aircraft, TWA had discharged hazardous waste for nearly 40 years through the operation of a wastewater treatment plant and associated basins for holding wastewater and waste oil, sludge drying beds, and a ravine field. *TWA*, 58 S.W.3d at 614. (During the 1970s, the sludge drying beds were excavated and the debris was first moved to the western edge of the facility, and later "again transferred and mainly dumped at a location at the east end of a Kansas City International airport runway." *TWA*, 58 S.W.3d at 614.) Notably, the claims against TWA arose from a proceeding brought against it by the EPA for knowing violations of the Resource Conservation and Recovery Act of 1976 (the RCRA) (42 U.S.C. § 6928 (2000)). *TWA*, 58 S.W.3d at 615. In holding that the disposal of the wastes that resulted in the pollution was not accidental, the court in *TWA* stated:

> "TWA was aware of the implications of RCRA to its operations at [the site]. *Such* deliberate and frequent disposal of waste that resulted in pollution is not accidental." (Emphasis added.) *TWA*, 58 S.W.3d at 623.

■ While *TWA* does appear to focus on the initial discharge of wastes, it is unclear whether the court did so because it decided that the relevant discharge was the initial placement of wastes, as opposed to subsequent migration, or whether it was because the court decided that the relevant discharge was the *wrongful* discharge, in knowing violation of the RCRA, and that such discharge would not be covered. Significantly, the court in *TWA* did not attempt to explain its focus on the initial placement, which is inconsistent with that of the other cases decided under Missouri law, namely, *Superior Equipment, General Dynamics*,[14] as well as *White*, by distinguishing or explaining its departure from these cases. Republic argues that some of the so-called violations in *TWA* occurred before the effective date of the RCRA and, hence, the holding in that case was not premised on the RCRA violations. However, these contentions completely ignore the express language of the court articulating the underlying rationale for its holding:

> "The discharges were part of TWA's operation at the *** site. TWA discharged its waste products used in the overhaul of its aircraft at

---

[14]Although the court discussed the decision of the Eighth Circuit reversing in part the district court's holding in *General Dynamics*, it did so solely in reference to whether the term "sudden" in the "sudden and accidental" exception to the pollution exclusion has a temporal element.

the \*\*\* site. After RCRA was enacted in 1976, TWA was expected to terminate its hazardous waste operations or apply for a permit under RCRA when it became effective in 1980. TWA notified the EPA of its operations, but ignored the effects of the statute. TWA was aware of the implications of RCRA to its operations at [the site]. Such deliberate and frequent disposal of waste that resulted in pollution is not accidental." *TWA*, 58 S.W.3d at 623.

In sum, *TWA* is neither explicit, nor is it fully analytical. Given, on the one hand, the decisions under Missouri law in *Superior Equipment*, *General Dynamics* and *White* and, on the other hand, one possibly divergent holding relied upon by Republic that is neither clear nor explicit, Republic's claim that *TWA* represents a change in the controlling law in Missouri is merely speculative and would not warrant a repudiation of *Emerson I*. Thus, the law of the case as set forth in *Emerson I* controls this appeal with respect to both types of sites involved and, therefore, summary judgment in favor of Republic predicated upon the trial court's reliance on and interpretation of *TWA* cannot be sustained.

■ Nor is Republic entitled to summary judgment based on its contention that the resulting damage was not "accidental" within the meaning of either policy.[15] As previously stated, in *Emerson I*, we held that the term "accidental" means unexpected and unintended, and does not preclude coverage for property damage caused by gradual, nonabrupt releases of pollutants. *Emerson I*, 319 Ill. App. 3d at 244-45, 743 N.E.2d at 648-49. Although, at least with respect to the Alabama site, there is evidence, which plaintiffs dispute, that plaintiffs may have known of leaks or other malfunctions in their containment structures and/or treatment facilities, and there is evidence that some employees at the Alabama site had, on an unspecified number of occasions, poured small amounts of TCA directly onto the ground in the vicinity of the concrete storage pad, there is also evidence that plaintiffs deposited their wastes into licensed containment structures and/or treatment facilities. Thus, a trier of fact could reasonably find or infer that plaintiffs expected their wastes to stay within the confines of those structures. Accordingly, there exists a genuine question of material fact as to how much of the pollution at the Alabama site was "accidental."

■ With respect to the Louisiana, Mississippi, and New York owned sites, plaintiffs similarly claim that they did not know and had no

---

[15]As previously noted, both the 1983-84 and the 1984-85 policies contain the "accidental" requirement—the former policy requiring the resulting pollution to be "accidental," and the latter policy requiring it to be "sudden and accidental."

reason to believe that pollutants were migrating from their licensed waste containment structures into the soil and groundwater, as there were no visible or otherwise perceivable clues to put plaintiffs on notice that releases of pollutants were taking place. Plaintiffs further claim that they did not learn of the releases of pollutants and property damage at the above-mentioned sites until after the termination of the policies at issue, when environmental consultants were hired to investigate the sites either as part of the sales of the facilities (Louisiana and New York) or corporate compliance audits (Mississippi) and informed plaintiffs of the property damage.

We agree with plaintiffs that this evidence is sufficient to raise a genuine question of material fact as to whether the pollution was "accidental." Therefore, as to coverage under the 1983-84 policy, which excepted "accidental" releases from the pollution exclusion, we conclude that the trial court erred in granting summary judgment in favor of Republic on the grounds that the pollution was not "accidental" with respect to the Alabama, Louisiana, Mississippi, and New York owned sites.

■ However, our adherence to the law of the case is dispositive on the issue of coverage with respect to the Mississippi and New York owned sites under the "sudden and accidental" exception to the pollution exclusion in the 1984-85 policy. While there remain questions of fact as to whether the pollution was "accidental" within the meaning of both policies involved, these issues of fact do not impact our disposition of the instant case with respect to whether the pollution at the Mississippi and New York sites was "sudden" under the 1984-85 policy. As we held in *Emerson I*, it is not sufficient, under the "sudden and accidental" language in the 1984-85 policy, that the pollution be unexpected, it must also be abrupt. *Emerson I*, 319 Ill. App. 3d at 243, 743 N.E.2d at 647. Because there is no evidence of abrupt discharges at the Mississippi and New York sites, we affirm the trial court's grant of summary judgment with respect to those sites under the 1984-85 policy.

In contrast, the grants of summary judgment with respect to the Alabama and Louisiana sites under the 1984-85 policy were inappropriate because there exist questions of fact as to how much the abrupt and unexpected discharges at those sites contributed to the overall contamination. As previously noted, with respect to the Alabama site, plaintiffs presented evidence of two abrupt, unexpected and unintended spills of TCE which might have contributed to the contamination at the site, and that evidence renders summary judgment premature. As we stated in *Emerson I*, such evidence of a sudden and accidental spill raises a triable issue as to whether that spill,

which satisfies the exception to the pollution exclusion, caused some of the damage for which plaintiffs are liable. *Emerson I*, 319 Ill. App. 3d at 248-49, 743 N.E.2d at 651. Similarly, with respect to the Louisiana site, plaintiffs introduced evidence that spontaneous explosions of magnesium took place in 1973 and 1974, and that some contamination may have been caused by those accidental events.[16] Thus, there are genuine issues of material fact, which may well necessitate additional expert discovery.[17]

■ Plaintiffs next contend that summary judgment in favor of Republic with respect to the Hatfield, Pennsylvania, site (under the 1983-84 policy) was inappropriate because Republic failed to meet its burden of proffering some evidence of a "release," within the meaning of the pollution exclusion, of contaminants at that site. As a general rule in Missouri, an insured bears the burden of proving all the elements that establish coverage under the terms of a policy, whereas the insurer has the burden of proving that the loss sustained was within a policy exclusion. *Grossman Iron & Steel Co. v. Bituminous Casualty Corp.*, 558 S.W.2d 255, 259-60 (Mo. App. 1977). Plaintiffs thus claim that once they satisfied their burden of showing an "occurrence," the burden then shifts to Republic to show that the pollution was caused by a "discharge" or "release" of pollutants, within the meaning of the pollution exclusion, and that Republic has not met that burden. We disagree.

Under Missouri law, plaintiffs have the burden of establishing a *prima facie* case that there has been property damage caused by or arising out of an "occurrence" and, moreover, establishing a *prima facie* case that they are entitled to coverage because the "accidental" or "sudden and accidental" *exception* to the pollution exclusion applies. See *TWA*, 58 S.W.3d at 621-22. Plaintiffs have already shown, as we held in *Emerson I*, that there was an "exposure to conditions"

---

[16]It does not matter that the abrupt and accidental events, such as the magnesium explosions, occurred sometime before the policy went into effect. As we discussed in *Emerson I*, where the property damage is "progressive" and "inseparable," such as that caused by chemical seepage, every policy in place during the ongoing destructive process is triggered. *Emerson I*, 319 Ill. App. 3d at 253-54, 743 N.E.2d at 655, citing *United States Gypsum Co. v. Admiral Insurance Co.*, 268 Ill. App. 3d 598, 604-05, 639-45, 643 N.E.2d 1226, 1230-31, 1252-56 (1994) (applying "continuous trigger" approach).

[17]Moreover, summary judgment is inappropriate with respect to the Louisiana site on alternative grounds. While conceding that the industrial waste lagoons at the Louisiana site caused soil contamination, plaintiffs dispute Republic's contention that the lagoons also caused groundwater contamination, and they offered evidence to rebut that contention.

resulting in property damage at the site. As we stated in *Emerson I* with respect to plaintiffs' burden of showing an "occurrence," it is sufficient to show an "exposure to conditions" without having to identify a specific event or release which caused the exposure. *Emerson I*, 319 Ill. App. 3d at 254, 743 N.E.2d at 655. By the same token, since plaintiffs were relieved of the burden of identifying a specific event or release which caused the exposure to conditions, within the meaning of the term "occurrence," Republic is similarly relieved of the burden of identifying a specific "discharge" or "release" within the meaning of the pollution exclusion. Accordingly, what is truly at issue here is whether *plaintiffs* can show that the pollution was "accidental." Republic argues that they cannot make that showing. We disagree.

Although plaintiffs, in support of their argument that Republic cannot show a "discharge" or "release," stressed the fact that plaintiffs' employees denied that any chemical spill ever took place, it does not necessarily follow that, as Republic contends, plaintiffs failed to establish that the pollution was "accidental."[18] The record shows that plaintiffs used TCE in their daily operations and that they discharged wastes into an underground storage tank and then into an adjacent sewer system. While it is unclear how the pollution resulted, the fact that no identifiable chemical spill ever took place does not foreclose the possibility that the resulting and, most likely, gradual pollution was, nevertheless, accidental. See *White*, 440 S.W.2d at 499, 510. We, therefore, agree with plaintiffs that questions of fact thus remain with respect to the Hatfield, Pennsylvania, site.

We next address plaintiffs' arguments with respect to the third-party sites. Plaintiffs contend that the trial court erroneously concluded that Urick and Therm-O-Disc knew that property damage had taken place at the Erie, Pennsylvania, and Dixiana, South Carolina, waste disposal sites and, therefore, the court erred in finding that the property damage at those sites was "expected or intended," and that plaintiffs thus failed to prove an "occurrence." Plaintiffs specifically argue that the court used the wrong temporal standard as to plaintiffs' knowledge of the property damage when it focused on plaintiffs' knowledge *prior to the inception of the 1983-84 policy* rather than *at the time the injury-causing acts took place.*

The parties are in disagreement as to the temporal focus and whether a subjective or an objective standard should be used in deciding whether there is a covered "occurrence." This disagreement is apparently compounded by the uncertainty as to which terms of the

---

[18]Within the meaning of the pollution exclusion in the 1983-84 policy.

policy control the disposition of this issue—whether it is the language "neither expected nor intended from the standpoint of the Insured," as used in the policy's definition of "occurrence," or whether it is the term "accidental" in the pollution exclusion. As previously stated, "occurrence" is defined as follows:

> "The term 'occurrence' shall mean (a) an accident, or (b) an event, or continuous or repeated exposure to conditions, which results during the policy period, in personal injury, property damage, or advertising liability *** *neither expected nor intended from the standpoint of the Insured.*" (Emphasis added.)

On the other hand, as previously noted, the pollution exclusion states, in relevant part, as follows:

> "[T]his policy does not apply to liability for personal injury or property damage arising out of the discharge, dispersal, release, escape or seepage of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, unless such discharge, dispersal, release or escape is *accidental*." (Emphasis added.)

We emphasize that the instant question focuses on a different facet of the "occurrence" definition than the one we addressed in *Emerson I*, where we dealt with a certified question as to whether it is sufficient to show an "exposure to conditions," as that term is used in the definition of "occurrence," without having to identify the specific event or release which caused the exposure and the resulting property damage. *Emerson I*, 319 Ill. App. 3d at 252, 743 N.E.2d at 654. Because of the absence of clear guidance on that issue from either Missouri state courts or federal courts construing Missouri law, we presumed that Missouri law as to that issue was the same as the law of the forum, Illinois. *Emerson I*, 319 Ill. App. 3d at 253, 743 N.E.2d at 655. Under Illinois law, it is sufficient to show an "exposure to conditions," without also having to identify the specific event or release which caused the exposure. In that context, we stated:

> "The record evidence of TCE contamination at the *** site supports the conclusion that there was a continuous 'exposure to conditions' resulting in property damage during Republic's policy period. Under Illinois law Emerson has met its burden of proving an 'occurrence' as defined in Republic's 1983-84 policy." *Emerson I*, 319 Ill. App. 3d at 254, 743 N.E.2d at 655-56.

However, it is clear that in discussing this aspect of "occurrence" in the context of the parties' contentions, in no way did we purport to eliminate the plain-language requirement under the definition of "occurrence" that such exposure must be "neither expected nor intended from the standpoint of the Insured."

To summarize, under *Emerson I*, if the evidence shows that the property damage occurred, in part, during the relevant policy period, the fact that no specific causative event has been identified does not preclude plaintiffs from recovering costs associated with remediating the site(s). Clearly, the policy next requires plaintiffs to show that the "occurrence" or, more precisely, the "exposure to conditions" was "neither expected nor intended from the standpoint of the Insured."

In accordance with the above-stated requirements of the policy, plaintiffs supported their motions for summary judgment with respect to the Erie, Pennsylvania, and Dixiana, South Carolina, waste disposal sites with evidence, undisputed and conceded by Republic, that there was an "exposure to conditions resulting in property damage" at both sites during the 1983-84 policy period. In addition, as noted above, plaintiffs also presented evidence that the "exposure to conditions" was "neither expected nor intended from the standpoint of the Insured."

Two issues arise at this juncture: (1) whether plaintiffs must show that the property damage was unexpected and unintended *at the time the haulers removed the wastes from plaintiffs' facilities and disposed of those wastes* at the two sites, or whether they must show that the property damage was (still) unexpected and unintended at a later date, *prior to the inception of the 1983-84 policy*; and (2) whether a subjective or an objective standard should govern the trial court's determination of plaintiff's knowledge of the property damage.

Plaintiffs contend that under Missouri law, the focus of the "expected or intended" analysis is the *subjective* expectation and intention of the policyholder *at the time the acts giving rise to liability took place*. In support, plaintiffs rely on *American Family Mutual Insurance Co. v. Pacchetti*, 808 S.W.2d 369, 371 (Mo. 1991) (*en banc*), and *Cameron Mutual Insurance Co. v. Moll*, 50 S.W.3d 329, 332 (Mo. App. 2001). Plaintiffs thus argue that summary judgment was inappropriate in light of the evidence that plaintiffs did not expect or intend that property damage would take place at the time the wastes were removed by the haulers.

■ Both *Pacchetti* and *Moll* dealt with clauses similar to the one involved here. In *Pacchetti*, the Supreme Court of Missouri held that whether the insured expected or intended injury is a question of fact, and "[i]t must be shown not only that the insured intended the acts causing the injury, but that injury was intended or expected from these acts." *Pacchetti*, 808 S.W.2d at 371. Similarly, the court in *Moll* interpreted *Pacchetti* to stand for the proposition that the fact that an insured's conduct was intentional does not, by itself, preclude coverage; rather, at that point, the focus is on whether the insured expected

or intended, presumably at the time of the act, to cause injury. *Moll*, 50 S.W.3d at 332.

Although neither *Pacchetti* nor *Moll* involved injuries that resulted long after the insured's intentional act, nothing in those cases purports to limit their holdings to injuries that immediately or shortly follow the act. Moreover, Republic cites no authority in support of its contention that coverage should be barred in cases where, at the time of the act, an insured did not expect or intend latent harm. Rather, Republic merely relies on certain fundamental principles of insurance law, as articulated in *American States Insurance Co. v. Mathis*, 974 S.W.2d 647, 649 (Mo. App. 1998), *i.e.*, that the intent of a commercial general liability policy, such as the policy at issue, is to protect against unpredictable liability that can result from accidental injuries to persons or property. This argument more appropriately invokes the "known loss" doctrine, involving the insurability of losses that have occurred by the time the policy's coverage took effect, and losses which were "substantially certain to occur" or which were a "substantial probability" (see 7 Couch on Insurance 3d § 102:8 (1997)), separately discussed in detail later on. However, *Mathis* lends no support to Republic's contention that under the *"occurrence" analysis*, the applicable standard is whether or not plaintiffs expected or intended the property damage before the inception of the policy, rather than at the time the wastes were removed from plaintiffs' facilities and disposed of. Accordingly, we find that the reasoning of *Pacchetti* and *Moll* applies with equal force to latent injuries, such as the ones involved in the instant case, and thus agree with plaintiff that the focus must be on whether, at the time the injury-causing acts took place, plaintiffs intended or expected an injury to result.

Plaintiffs next contend that under Missouri law, when a policy's "occurrence" clause requires an evaluation from the standpoint of the policyholder, the standard for judging whether there was an "occurrence" is the subjective knowledge and intent of the policyholder. In support, plaintiffs rely on *Moll*, 50 S.W.3d at 332, which held that a subjective standard applies where a policy's "occurrence" definition requires, as is the case here, that the damage be unexpected and unintended "from the standpoint of the insured." Plaintiffs thus argue that the trial court misapplied the terms of the 1983-84 policy by utilizing both a subjective and an objective standard to determine plaintiffs' expectations and intentions concerning the third-party sites, and that the trial court's application of an objective standard deprived plaintiffs of the protection of the policy.

Republic, on the other hand, argues that under Missouri law, courts can infer an insured's subjective knowledge and intent from the

nature and circumstances of the insured's act. In support, Republic relies on *Truck Insurance Exchange v. Pickering*, 642 S.W.2d 113, 116 (Mo. App. 1982), which construed an "occurrence" definition almost identical to the one at issue. In deciding what is a proper analysis of the terms "from the standpoint of the insured," the court noted that under Missouri law, an act of an insured need not be expressly intentional, but can be inferred as a matter of law from facts and circumstances surrounding the act. *Pickering*, 642 S.W.2d at 116. We agree.

We note that *Moll* and *Pickering* are not inconsistent. The court in *Moll* reasoned that a subjective standard must be used in determining whether the injuries were expected or intended because the policy language was clear and unambiguous in requiring a fact finder to look at whether the injury was expected and intended "from the standpoint of the insured." However, the court went on to explain:

> "In the context of exclusion clauses such as this one, where an insured claims there was a benign intent behind a harmful act, Missouri courts have employed two different tests to assess the intent of the insured. *American Family Mutual Ins. v. Franz*, 980 S.W.2d 56, 58 (Mo. App. W.D. 1998). Under the 'subjective' test, the coverage is excluded based upon the insured's own actual subjective intent to cause harm. *Id.* Conversely, under the 'objective' test, coverage is excluded if it is determined that a hypothetical reasonable person would have foreseen harm from his or her acts. *Id.*
>
> *** Whether a subjective or objective approach was used, however, makes little practical difference. *Franz*, 980 S.W.2d at 58. *Even when the subjective approach is used, an insured's subjective intent to cause injury can still be inferred from the nature and circumstances of the insured's intentional acts*, especially when an intentional act results in injuries which are the natural and probable consequence of such an act. *Id.* This is because courts are reluctant to accept the insured's own testimony as conclusive on the question of intent[.] *Id.* Thus, 'an admission of specific intent is not the only way to show intent to cause harm; it can be inferred from facts and circumstances surrounding an act.' *Truck Insurance Exchange v. Pickering*, 642 S.W.2d 113, 116 (Mo. App. W.D. 1982), citing, *Camp v. John Hancock Mut. Life Ins. Co.*, 165 S.W.2d 277, 281[5] (Mo. App. 1942)." (Emphasis added.) *Moll*, 50 S.W.3d at 332-33.

In sum, the inquiry under the "occurrence" analysis should be whether, at the time the wastes were removed for disposal from plaintiffs' facilities, plaintiffs expected or intended the pollution to result; such expectation or intent may be inferred from the nature and circumstances of plaintiffs' intentional acts.

■ For the reasons that follow, the trial court erred in ruling that no "occurrence" can be proven under these facts. As previously noted, plaintiffs satisfied the first component of showing an "occurrence" by producing evidence of "continuous or repeated exposure to conditions" with respect to wastes deposited at the third-party sites. Next, as noted above, plaintiffs were required to show that the "exposure to conditions" was "neither expected nor intended from the standpoint of the Insured."

With respect to the Erie, Pennsylvania, site, we have already found in *Emerson I*, albeit in the context of our discussion as to whether the damage at the site was "accidental" within the meaning of the pollution exclusion, that plaintiffs presented evidence demonstrating that they expected and intended for their wastes to be disposed of properly and neither expected nor intended any resulting harm to the environment and, correspondingly, plaintiffs at a minimum raised a triable issue as to whether the releases of pollutants at the Erie site were accidental. *Emerson I*, 319 Ill. App. 3d at 246, 743 N.E.2d at 650-51. While we acknowledge the apparent difference in terminology between "neither expected nor intended from the standpoint of the Insured," as used in the definition of "occurrence," and the term "accidental," within the meaning of the pollution exclusion, the two terms essentially mean the same thing. In *Emerson I*, we held that property damage was "accidental" under Missouri law, where the policyholder " '*neither expected nor intended* the illegal and improper activity of the hazardous waste transporter that resulted in hazardous waste contamination.' " (Emphasis added.) *Emerson I*, 319 Ill. App. 3d at 245, 743 N.E.2d at 649, quoting *General Dynamics*, 783 F. Supp. at 1207-08. In other words, under Missouri law, the term "accidental," within the meaning of the pollution exclusion, means unexpected and unintended from the standpoint of the insured. *Emerson I*, 319 Ill. App. 3d at 245, 743 N.E.2d at 649. Accordingly, the same conclusion, that plaintiffs at a minimum raised a triable issue as to whether the releases of pollutants at the Erie site were accidental, must be reached under the "occurrence" analysis.

By the same token, the same conclusion must be reached with respect to the Dixiana, South Carolina, site, where plaintiffs offered evidence that Therm-O-Disc expected that the hauler would dispose of the wastes properly and did not expect that the wastes would, or intend them to, be discharged from a disposal facility or damage the environment.

Plaintiffs, given the underlying context of cross-motions for summary judgment, further contend that the trial court erred in failing to conclude that they demonstrated an "occurrence" at both waste

disposal sites because Republic conceded the fact that the damage at the waste disposal sites was unexpected and unintended at the time the wastes were removed from plaintiffs' facilities. Our review of the record, however, does not support plaintiffs' claim of such concession on the part of Republic. Rather, more discovery is needed, as the parties marshalled their respective evidence with regard to the wrong temporal standard, as discussed above.

We must, however, now determine whether the grant of summary judgment in favor of Republic was proper on other grounds because the "known loss" doctrine may apply and preclude coverage. As a general rule in Missouri, it is against public policy to insure a loss that is known or apparent to the insured. *United Capitol Insurance Co. v. Hoodco, Inc.*, 974 S.W.2d 572, 574 (Mo. App. 1998); *Presley v. National Flood Insurers Ass'n*, 399 F. Supp. 1242, 1244 (E.D. Mo. 1975). The "known loss" doctrine is rooted in preventing fraud on the part of the insured, who would obtain an insurance policy knowing that it has suffered or is in imminent danger of suffering a loss, and who would fail to disclose these facts to the insurer. *Hoodco*, 974 S.W.2d at 575. The practical application of this doctrine invokes two questions: (1) what is a "loss" and (2) when does a loss become "known"? Insurers would like to interpret both terms expansively— including in the definition of loss spills, discharges or contamination— and urge that such loss becomes known, thereby precluding coverage, at the time spills and discharges occur, contamination is first discovered, or when a third-party waste disposal facility used by the insured is closed and/or placed on the National Priorities List. See G. Rothschild, *Resolving Environmental Insurance Claims*, 20 No. 1 Prac. Real Est. Law 15, 25 (2004). Many states, including Missouri, have not had occasion to address this issue in the context of coverage under a comprehensive general liability (CGL) policy for damages due to environmental pollution. Of those that have, many hold that an environmental loss is not known until a policyholder learns that it has potential liability for investigation and/or remediation. See 20 No. 1 Prac. Real Est. Law at 25. However, as discussed below, there is disagreement as to whether the precise standard should be (1) that of policyholder's awareness of conditions, facts, or events that may lead to a future claim and the imposition of environmental liability; (2) that of substantial awareness of either impending environmental contamination or imminent CERCLA liability; or (3) that of awareness of a known liability, rather than merely a potential liability, at the time the insurance was purchased. See K. Kolesar, *Insurance Coverage for CERCLA Claims Under Comprehensive General Liability Policies: Cleaning Up Hazardous Waste in the Legal Environment*, 68 Notre Dame L. Rev. 549, 565-66 (1993).

Republic appears to argue that the applicable standard governing the outcome of this matter is the second standard, namely, that of substantial awareness on the part of plaintiffs of either impending environmental contamination or imminent (or known) liability. Republic specifically argues that even if plaintiffs did not intend or expect the property damage at the time they disposed of the waste, as long as plaintiffs knew or should have known, at the time they purchased the 1983-84 policy, that there was a substantial probability that they would suffer or had already suffered a loss, plaintiffs' claim for coverage should be barred.

Plaintiffs, on the other hand, contend that the third standard is applicable here. More specifically, plaintiffs argue that under Missouri law, claims under CGL policies, such as the one involved here, are not uninsurable under the "known loss" doctrine as long as all the material facts are not concealed and the extent of legal liability is yet to be determined. In support, plaintiffs principally rely on *Monsanto Co. v. Aetna Casualty & Surety Co.*, No. 88C—JA—118 (Del. Super. December 9, 1993) (purporting to apply Missouri law).[19]

In *Monsanto*, the insurers agreed to indemnify the policyholder against "loss," "excess net loss," or "ultimate net loss" arising out of the hazards covered in the policy, such loss being defined in relevant part as "sums paid in settlement of losses for which the insured is liable." *Monsanto*, slip op. at ___. The court found that, "as dictated by the policies themselves, it is *not* the physical damage to person or property which triggers the policies' coverage; what triggers the cover-

---

[19]Delaware Superior Court was exercising original (trial) jurisdiction in *Monsanto*, ruling on motions for summary judgment. Apparently, plaintiffs are citing to *Monsanto* for persuasive value.

Plaintiffs also cite to *M.F.A. Mut. Ins. Co. v. Quinn*, 259 S.W.2d 854, 860 (Mo. App. 1953), for the proposition that under Missouri's "known loss" doctrine, mere knowledge that a claim has been, or potentially might be, asserted against a policyholder does not make the resulting loss uninsurable. In *Quinn*, the insured had no knowledge that an automobile accident involving his automobile (which was driven by a family member) had occurred when he paid in person to the insurer's agent a premium to renew his policy, and the insurer accepted the premium at its home office after it had full knowledge of the collision and investigated its circumstances. *Quinn*, 259 S.W.2d at 859-60. For this reason, *Quinn* is inapposite. Moreover, the court apparently limited its holding to the facts of the case, stating:

"It would not be against the public interest to permit an insurance company to fulfill a contract which it had invited its customer to accept, where the facts are as they appear in this case." *Quinn*, 259 S.W.2d at 860.

age is the settlement reached or judgment rendered which imposes upon Monsanto the obligation to *pay* for that harm." (Emphasis in original.) *Monsanto*, slip op. at ___.

The court reasoned that due to a crucial difference between first- and third-party insurance contracts—namely, that in the case of first-party insurance, the insurer is to pay money due under the policy upon the happening of physical harm or property damage to the insured, whereas when one purchases third-party insurance (which is what CGL policies usually provide) one insures against the possibility of legal liability due to damages sustained by a third party—the reasoning and holding of the *Presley* line of cases, which involved first-party insurance only, does not apply with the same force to third-party insurance contracts. *Monsanto*, slip op. at ___. In the absence of Missouri authority applying the "know loss" doctrine to a third-party insurance policy, the court in *Monsanto* relied on *Montrose Chemical Corp. of California v. Admiral Insurance Co.*, 35 Cal. App. 4th 335, 5 Cal. Rptr. 2d 358 (1992),[20] and *In re MGM Grand Hotel Fire Litigation*, 570 F. Supp. 913 (D. Nev. 1983), and agreed with those cases:

> "[A]n *occurrence* which may give rise to coverage may already exist while the *insurable loss* is still undetermined and thus, unknown. Therefore, as long as all the material facts are not concealed and the extent of legal liability is yet to be determined, the issuance of insurance to cover the liability resulting from a known occurrence is not violative of public policy. Granted, in such instances, the insurer may find the risk of liability too great, or the insured may find the cost of such insurance exorbitant, and so a policy may never materialize. But these are decisions for underwriters and consumers to make as a result of arms-length negotiations." (Emphasis in original.) *Monsanto*, slip op. at ___.

The court, therefore, held that if the insured's legal liability was known in advance of coverage, then a "known loss" existed and coverage is thereby precluded as a matter of Missouri public policy. *Monsanto*, slip op. at ___.

Similar to the policies in *Monsanto*, the 1983-84 policy here requires Republic to "indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed upon him by law or liability assumed by him under contract or agreement." The policy further defines "ultimate loss" to mean "the total sum which the Insured *** becomes legally obligated to pay as damages *** either through adjudication or compromise."

---

[20]Since affirmed and superceded by *Montrose Chemical Corp. of California v. Admiral Insurance Co.*, 10 Cal. 4th 645, 913 P.2d 878, 42 Cal. Rptr. 2d 324 (1995).

Plaintiffs thus contend that the "known loss" doctrine does not preclude coverage in the instant case because although the occurrence giving rise to liability may have transpired, plaintiffs' legal liability was yet to be determined when the policy incepted. In other words, plaintiffs argue that the "known loss" doctrine does not preclude coverage even if the trial court was correct in concluding that plaintiffs knew of property damage at the two waste disposal sites prior to the inception of the 1983-84 policy because plaintiffs were not legally liable for the property damage at the Erie, Pennsylvania, and Dixiana, South Carolina, waste disposal sites until, at the earliest, 1995 or 1996, when they resolved their respective liabilities with the EPA. Plaintiffs point out that, as of November of 1983, they had not incurred liability resulting from the waste haulers' improper disposal of the wastes at the third-party sites and further claim that they had no reason to believe that they could be held liable for property damage at either site. In addition, plaintiffs argue that no legal basis for holding Urick liable even existed prior to *United States v. Wade*, 577 F. Supp. 1326, 1331-33, 1339-40 (E.D. Pa. 1983), which was decided December 20, 1983, after the inception of the policy, and held that shipment of nonhazardous wastes—such as Urick's foundry sand, which did not contain a reportable quantity of hazardous substances under the Federal Water Pollution Control Act—could result in retroactive liability under CERCLA. Lastly, plaintiffs point out that there is no evidence that they misrepresented or concealed material facts concerning the claims that had been, or likely could have been, asserted against them concerning the waste disposal sites, notwithstanding the fact that the trial court had presented Republic with an opportunity to provide such evidence.

We agree that under the approach to the "known loss" doctrine taken in *Monsanto*, coverage is not precluded under these facts. However, *Monsanto* was decided by a trial court of Delaware and, as such, has weak persuasive authority. Moreover, although the court in *Monsanto* purported to decide the question of applicability of the "known loss" doctrine under Missouri law, in fact, as discussed above, in the absence of Missouri authority applying the "know loss" doctrine to a third-party insurance policy, the court relied on California and Nevada cases. As we held in *Emerson I*, where Missouri law does not address the issue at hand, we presume that Missouri law as to that issue is the same as that of the forum, Illinois. *Emerson I*, 319 Ill. App. 3d at 252, 743 N.E.2d at 654. For the foregoing reasons, we decline to follow *Monsanto* and, instead, will follow the decision on point of our supreme court in *Outboard Marine Corp.*, 154 Ill. 2d 90, 607 N.E.2d 1204.

■ In *Outboard Marine Corp.*, 154 Ill. 2d at 103-04, 607 N.E.2d at 1210, our supreme court applied the "known loss" doctrine to a CGL policy. In contrast to the *Monsanto* court, our supreme court did not distinguish between a first- and third-party insurance policy. *Outboard Marine Corp.*, 154 Ill. 2d at 103-04, 607 N.E.2d at 1210. Rather, the court adhered to the same general principles of insurance law as enunciated under Missouri law in *Hoodco* and *Presley*:

> "By its very nature, insurance is fundamentally based on *contingent risks* which may or may not occur. [Citations.] One dictionary defines 'insurance' as '[a] contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an *unknown or contingent event* and is applicable only to *some contingency or act to occur in [the] future.*' (Emphasis added.) (Black's Law Dictionary 721 (5th ed. 1979).) If the insured knows or has reason to know, when it purchases a CGL policy, that there is a substantial probability that it will suffer or has already suffered a loss, the risk ceases to be contingent and becomes a probable or known loss. [Citation.] Where the insured has evidence of a probable loss when it purchases a CGL policy, the loss is uninsurable under that policy (unless the parties otherwise contract) because the 'risk of liability is no longer unknown.' [Citations.] Therefore, the insurer has no duty to defend or indemnify the insured with respect to the known loss *ab initio*, unless the parties intended the known loss to be covered. [Citations.]" (Emphasis in original.) *Outboard Marine Corp.*, 154 Ill. 2d at 103-04, 607 N.E.2d at 1210.

In the context of coverage under a CGL policy for environmental contamination, the supreme court stated:

> "[T]he known loss doctrine may be invoked if the insurers demonstrate that [the insured] knew or had reason to know, at the time it purchased the CGL policy, that there was a substantial probability that loss or liability would ensue due to the *** contamination for which it is seeking coverage." *Outboard Marine Corp.*, 154 Ill. 2d at 107, 607 N.E.2d at 1212.

The supreme court further found that coverage is barred if the insured, prior to the commencement of the policy, received an administrative order from the EPA confirming environmental contamination due to the insured's operations—because such an order, as a matter of law, gives the insured knowledge of a substantial probability that claims would be made against it. *Outboard Marine Corp.*, 154 Ill. 2d at 105-06, 607 N.E.2d at 1210-11.

■ For the reasons stated below, Republic is entitled to summary judgment under the "known loss" doctrine with respect to the Erie, Pennsylvania, site, but is not entitled to summary judgment with respect to the Dixiana, South Carolina, site. As previously noted, the

trial court in the instant case, albeit as part of the "occurrence" determination, made a finding of fact that the property damage at the Erie, Pennsylvania, site was expected and intended in light of the facts that, prior to the policy's inception in November of 1983, the site was placed on the National Priorities List, Urick was named as a potentially responsible party, and Urick was sued by neighboring landowners. The trial court similarly found that the property damage at Dixiana, South Carolina, site was expected and intended because in 1978 a state court ordered that operations at the Dixiana site cease, by 1980 water contamination was confirmed, and in 1982 plaintiffs began defending themselves against the EPA for the pollution at the site. Plaintiffs, nevertheless, argue that summary judgment in favor of Republic would be inappropriate. While plaintiffs acknowledge that the facts involved are undisputed, they argue that reasonable minds could disagree as to the proper inferences to be drawn from these undisputed facts. Plaintiffs contend that the following inferences could reasonably be drawn from the undisputed facts concerning the Pennsylvania site: (1) prior to the inception of the 1983-84 policy on November 1, 1983, Urick had no reason to believe or anticipate that its wastes caused property damage at the Millcreek Landfill, and (2) prior to the inception of the 1983-84 policy, Urick had no reason to anticipate liability in connection to its shipment of wastes to the site. It is, therefore, plaintiffs' position that summary judgment at this juncture was inappropriate.

In support, plaintiffs point to the evidence that prior to July of 1983, Urick was unaware of the allegations that Sitter had commingled Urick's foundry sand and nonhazardous wastes with those of other companies and had disposed of the wastes improperly at the site. Plaintiffs admit that in July of 1983, Urick received a copy of a complaint in a contribution action which was brought against any persons who may have used Sitter for waste disposal. However, plaintiffs claim that it was not until Urick received the EPA's September 16, 1983, notice letter that it became aware of the "EPA's belief that Urick's non-hazardous waste may have been disposed of at the site." Although plaintiffs further admit that, shortly thereafter, Urick discussed the matter with its counsel, they point to the fact that Urick's counsel advised it that there appeared to be no evidence against Urick or other foundries to link them to the Millcreek Landfill site. Moreover, plaintiffs maintain that because the EPA at that time refused to provide Urick with specific documentation or evidence that "affirmatively linked" Urick to the site, Urick did not learn about its connection with the site until "well after" the inception of the 1983-84 policy on November 1, 1983.

We uphold the grant of partial summary judgment with respect to the Erie, Pennsylvania, site. As previously stated, our supreme court

held in *Outboard Marine Corp.* that, as a matter of law, the receipt of an administrative order from the EPA, similar in nature to the September 1983 EPA notice letter to Urick, gave an insured knowledge of substantial probability that claims would be made against it. Moreover, in July of 1983, Urick, in fact, received a copy of a complaint of the lawsuit filed against it and other defendants by landowners whose properties were in the vicinity of the Millcreek Landfill. Accordingly, there can be no question of fact, nor can reasonable persons draw divergent inferences, as to plaintiffs' knowledge of a substantial probability that claims could be made against Urick.

With respect to the South Carolina site, plaintiffs similarly contend that Therm-O-Disc was unaware, prior to the inception of the 1983-84 policy, of property damage caused by SCRDI's operations at the site. Plaintiffs claim that Therm-O-Disc first became aware of the existence of the site, let alone property damage at the site and the EPA's allegations of Therm-O-Disc's possible liability in connection with the site, when it received a notice letter from the EPA in December of 1988. Plaintiffs further claim that Therm-O-Disc had no reason to know about problems at the site prior to receiving the EPA's 1988 letter because it did not own the site and did not know that SCRDI had taken Therm-O-Disc's wastes to the site, nor was it party to litigation or administrative proceeding concerning the site.

Plaintiffs, however, concede that Therm-O-Disc's former senior environmental affairs employee had reported in a memorandum, dated February 25, 1991, total costs expended by Therm-O-Disc for the site since December 1982, the date the EPA placed the site on the National Priorities List. The portion of the memorandum relating to the site states, in pertinent part:

> *"Dixiana Site*
>
> This site appears to be a transfer station where waste was stored before it went to the Bluff Road landfill. Since 1982, this was listed as a superfund site by the EPA. *Since 1982, we have incurred legal expenses of $38,928.00 defending [Therm-O-Disc's] position that their wastes were not disposed of at the Dixiana Site.* No correspondence or activity since February 23, 1990." (Emphasis added.)

Plaintiffs, nevertheless, argue that the trial court erred in interpreting this evidence—consisting of a "single sentence taken out of context"—to mean that Therm-O-Disc actually began defending itself with respect to the site in December of 1982.

We observe that it may very well be that the date of 1982 was merely a reference point marking the year when the Dixiana, South Carolina, site was placed on the National Priorities (Superfund) List. The memorandum does not purport to state that costs were, in fact

incurred in 1982 or 1983, prior to the inception of the policy. Plaintiffs also point out that the trial court was also presented with evidence to the contrary, such as the deposition of Therm-O-Disc's former outside environmental counsel, that Therm-O-Disc did not begin defending itself against potential liability with respect to the South Carolina site until after receiving the EPA's 1988 letter. Plaintiffs thus contend that the evidence in the record demonstrates the existence of a question of fact, and the trial court, therefore, impermissibly and erroneously weighed evidence and made credibility determinations.

We agree with plaintiffs that summary judgment on these facts is premature with respect to the Dixiana, South Carolina, site. See *Krautsack v. Anderson*, 329 Ill. App. 3d 666, 676-77, 768 N.E.2d 133, 143 (2002) (reversing summary judgment where the trial court's conclusion ignored the totality of evidence and merely focused upon a single statement taken out of context, which amounted to impermissible weighing of evidence or judgment of credibility). There is a genuine question of fact as to whether plaintiffs actually began defending against potential liability with respect to the Dixiana site prior to November of 1983. Furthermore, reasonable minds could disagree as to whether plaintiffs had knowledge prior to the inception of the policy of a *substantial probability* that claims would be made against them in connection with the Dixiana site, given that in 1978 a state court ordered operations at the Dixiana site to cease, by 1980 water contamination was confirmed, and the ongoing pollution problems in connection with the site were covered in local newspaper articles during the late 1970s and early 1980s.

Republic next argues that there are alternative grounds not reached by the trial court for affirming *all* summary judgment rulings. However, in its brief on appeal, Republic raises the two alternative grounds—breach of notice and voluntary payment provisions of the 1983-84 policy—only with respect to *two* of the seven sites at issue, the Erie and Hatfield, Pennsylvania, sites. In light of this apparent waiver of its arguments with respect to the remainder of the sites and because of our disposition of this case, specifically, our affirmance of the trial court's grants of summary judgment with respect to the Erie, Pennsylvania, site, we will only address Republic's arguments as they pertain to the Hatfield, Pennsylvania, site.

The 1983-84 policy contains the following conditions precedent to coverage:

"CONDITIONS

7. Notice of Occurrence. When an occurrence takes place, which, in the opinion of the insured, involves or may involve liability on the part of the Company, prompt written notice shall be given by

or on behalf of the insured \*\*\*. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence \*\*\*. Failure to so notify the company of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to a claim hereunder shall not prejudice such claim provided that notice is then given.

8. Assistance and Cooperation of the Insured. \*\*\* The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.''

Republic argues that plaintiffs breached the relevant notice provisions because they did not provide Republic with notice of their claim for the Hatfield site until March of 1993, seven years after being named a potentially responsible party (PRP)[21] and four years after allegedly having exhausted their self-insured retention under the policy. The record shows that as early as 1986, plaintiffs engaged in extensive negotiations with state and federal authorities, retained counsel to represent their interests, hired consultants to perform analyses and evaluations at the site, and conducted investigations and interviews with current and former employees, thereby incurring most or all of the costs they claim against Republic. Republic argues that it has suffered prejudice from plaintiffs' late notice as a matter of law because all of the costs that plaintiffs seek to recover from Republic consist of defense and investigation costs, and with respect to those costs Republic alleges that it could have investigated the loss and possibly settled it for an amount less than what plaintiffs now seek.

Republic similarly contends that plaintiffs breached the voluntary payments provision of the policy by incurring defense and investigation costs without first obtaining Republic's acquiescence and consent. Republic claims that as a result, it was denied the opportunity to investigate the facts, to settle the loss early on, and to oversee and dispute the amount of defense and investigation costs incurred by plaintiffs.

Plaintiffs dispute that their notice was untimely and argue that the voluntary payments clause does not apply to prenotice conduct. They further argue that Republic cannot prevail on its late notice or breach of voluntary payments clause defenses unless it proves that it

---

[21]Plaintiffs were named a PRP in May of 1987, some *six* years before notifying Republic.

suffered actual and substantial prejudice as a result, and that mere speculation and conclusory allegations are insufficient for the purposes of establishing prejudice. Plaintiffs further cast doubt on the viability of Republic's claim of prejudice by pointing out that excess carriers, such as Republic, generally do not investigate claims and, in fact, once plaintiffs provided notice, Republic chose not to conduct any investigation.

We note that Missouri courts historically have been reluctant to excuse an insurer from its contractual obligations because of an insured's breach of notice or similar policy provisions that do not prejudice the insurer, and the burden of showing prejudice is on the insurer. See *Tresner v. State Farm Insurance Co.*, 913 S.W.2d 7, 11 (Mo. 1995) (*en banc*). Thus, we need not examine whether plaintiffs had, in fact, breached the notice and voluntary payment provisions because Republic cannot prevail on these defenses unless it proves that it suffered prejudice as a result. The presence of prejudice in such a context is a question of fact to be determined on the particular facts of each case. *Tresner*, 913 S.W.2d at 11. Mere speculation and conclusory allegations are insufficient for purposes of establishing prejudice. See *Hendrix v. Jones*, 580 S.W.2d 740, 743-45 (Mo. 1979) (*en banc*). We thus agree with plaintiffs that there exists, at a minimum, a triable question of fact as to whether Republic suffered prejudice. Accordingly, the grant of summary judgment in favor of Republic as to the Hatfield site cannot be sustained on the alternative grounds of breach of notice and voluntary payment provisions.

For the reasons set forth above, we reverse, in part, the judgment of the trial court granting summary judgment in favor of Republic with respect to the Vernon, Alabama; Shreveport, Louisiana; Philadelphia, Mississippi; Melville, New York; and Hatfield, Pennsylvania, owned sites as to coverage under the 1983-84 policy. We also reverse the grants of summary judgment in favor of Republic with respect to the Vernon, Alabama, and Shreveport, Louisiana, owned sites as to coverage under the 1984-85 policy. Lastly, we reverse the grant of summary judgment in favor of Republic with respect to the Dixiana, South Carolina, third-party site. In accordance with the foregoing, the cause is remanded for further proceedings consistent with this opinion.

We affirm the remainder of the judgment of the trial court, namely, the grants of summary judgment in favor of Republic with respect to the Philadelphia, Mississippi, and Melville, New York, owned sites as to coverage under the 1984-85 policy, and the grant of summary judg-

ment in favor of Republic with respect to the Erie, Pennsylvania, third-party site.

Affirmed in part and reversed in part; cause remanded.

McNULTY and McBRIDE, JJ., concur.